**Michael J. PUGLISE, as administrator for the Estate of Ricky A. McCord, Karen McCord, and Kenneth S. D'Haeseleer, Plaintiffs,**

v.

**COBB COUNTY, GEORGIA, Robert Hightower, Individually and in his official capacity as *Director of Public Safety for* Cobb County, etc., Defendants.**

**Civil Action No. 1:95CV1697–RWS.**

United States District Court,
N.D. Georgia,
Atlanta Division.

April 8, 1998.

John Raymond Burdges, Atlanta, GA, Michael J. Puglise, Snellville, GA, for Plaintiffs.

Jerry Lovvorn Gentry, Christine C. Daniel, Office of Cobb County Attorney Law Dept., Atlanta, GA, Joseph A. Cochran, Cochran, Camp & Snipes, Smyrna, GA, Theodore Freeman, Maureen Middleton, Freeman, Mathis & Gary, Atlanta, GA, for Defendants.

## MEMORANDUM OPINION AND ORDER

STORY, District Judge.

Plaintiffs Kenneth D'Haeseleer and the estate of Ricky McCord bring this action against Cobb County, the City of Smyrna, and various employees of the police departments of these two municipalities,[1] asserting that their conduct violated McCord's and D'Haeseleer's rights under the Fourth Amendment, the Due Process Clause, and 42 U.S.C. § 1985(2), and asserting state law claims for negligence, and false imprisonment. In addition, Karen McCord asserts state law claims for wrongful death and loss of consortium.[2] All defendants other than

---

**1.** Collectively referred to herein as the Cobb County defendants are Cobb County, Director of Public Safety R. Hightower, Chief of Police C. Johnson, Officer T. Noles, Detective M. Hicks, Detective G. Ellison, Sergeant K. Flynn, and Lieutenant G. Davis. Collectively referred to herein as the Smyrna defendants are the City of Smyrna, Chief of Police S. Hook, Officer R. Burkhart, Officer R. Harrison, Officer L. Harrell, Officer D. Liber, Officer J. Chastain, Detective M. Moore, Detective K. Wrozier, and Captain W. Brack.

**2.** In their briefs in opposition to the motions for summary judgment, the plaintiffs purport to waive their claims under the Fourteenth Amendment, against the officers at the scene of the shooting, and under the Fifth Amendment. This Court construes these statements as a motion for leave to amend the complaint to eliminate these claims. See Fed.R.Civ.P. 15(a); *Brown v. Hughes,* 894 F.2d 1533, 1539 (11th Cir.), cert. denied, 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Sherman v. Hallbauer,* 455

the municipalities are sued in both their individual and official capacities.

All defendants have moved for summary judgment on all claims. In addition, the defendants have moved to strike various exhibits presented by plaintiffs in opposition to the motions for summary judgment and plaintiffs have moved to strike as untimely the Smyrna defendants' reply in support of their motion.

### Facts

Viewed in a light most favorable to plaintiffs, see *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), the facts are as follows:

McCord and D'Haeseleer consumed a few beers each over the night of September 10–11, 1993. In the early morning of September 11, McCord was driving in his pickup truck on I–285, with D'Haeseleer as a passenger, when Cobb County Police Officer T. Noles observed him driving at a speed in excess of 80 miles per hour. Noles followed McCord's truck as it exited, stopped at a traffic signal, and then squealed its tires laying drag onto Atlanta Road, when Noles signaled the truck to stop. McCord continued south on Atlanta Road, pulled into a parking lot, circled back to face Atlanta Road, and then stopped. Noles approached the truck on foot and, upon reaching the driver's door, smelled alcohol. Noles began to instruct McCord to turn off the engine, but McCord drove back onto Atlanta Road. Noles returned to his car and began pursuit, operating all emergency signals and radioing his location and status, including the information that the truck held two occupants.

Shortly thereafter, three City of Smyrna Police Department patrol units operated by Officers L. Harrell, R. Burkhart, and K. Harrison, joined the pursuit. Burkhart and Harrell radioed information regarding the pursuit to Smyrna police dispatch. The two police departments could not communicate by radio and did not communicate by any other means. A dispatcher riding in one of the Smyrna patrol cars saw that the truck contained two occupants, but it is disputed whether the officers driving the Smyrna patrol cars knew that there were two occupants. There is no evidence that these Smyrna officers radioed that the truck contained two occupants.

McCord made a right turn at Spring Road. A short distance down Spring Road, McCord made a U-turn. His truck collided with the car operated by Harrison, who had attempted to block his path. Burkhart stopped his patrol car behind the truck and approached the truck on foot, when McCord backed the truck up, striking Burkhart. When Harrell saw the truck backing toward Burkhart, he fired at the truck. Burkhart, unhurt, returned to his car. McCord began driving forward again, towards Harrison, who fired two shots at the truck. Noles fired at the rear of the truck. Harrell fired two or three more shots, at least one of which shattered the rear window. The truck then drove around Harrison's car, turning onto Atlanta Road in a northerly direction.

Noles and Burkhart continued pursuit. Noles radioed of continued pursuit and that McCord had used deadly force against the Smyrna units. While in pursuit, they were joined by Smyrna Police Officer J. Chastain, who had heard about the pursuit on his radio.

McCord attempted a right turn onto Windy Hill Road, but hit a utility pole and stopped. Chastain and Noles stopped their patrol cars in an effort to block the truck and approached the truck on foot, with weapons drawn. McCord began driving again, and Noles ran beside the truck firing into the cab. The truck then began traveling in reverse, and Chastain, believing himself in danger from the truck, fired at McCord. At approximately the same time, Smyrna Police Officer D. Liber, who had heard radio traffic reporting the pursuit, arrived on the scene. Seeing Noles moving beside the truck and believing the truck was dragging him, Liber jumped out of his car, and fired several shots at the truck.

F.2d 1236, 1242 (5th Cir.1972). Leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). *See also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Accordingly, this Court shall grant Plaintiffs leave to amend the complaint.

Liber then chased the truck on foot as it backed up Windy Hill Road. While McCord's truck was traveling in reverse, Burkhart's patrol car pushed the truck off the road, in an attempt to stop it. The truck went up a slight embankment, then slid down, and continued traveling in reverse along Windy Hill Road back toward the intersection with Atlanta Road. Liber fired several more shots at the cab of the truck, which then collided with a Cobb County DUI Task Force unit and stopped, blocked in by other patrol cars. There is evidence that additional shots were fired after the truck stopped.

During the incident, the truck had passed close to several vehicles on the roads on which it was traveling.

As the pursuit was proceeding northbound on Atlanta Road, Cobb County supervisors Sergeant K. Flynn and Lieutenant G. Davis became aware of the situation and proceeded to the area of the pursuit. After arriving at the Windy Hill Road scene, while officers were approaching the truck on foot, neither Davis nor Flynn took active control of the situation.

A total of 54 rounds were fired during this incident, including sixteen 40 mm rounds fired by Noles, the only officer using a 40 mm weapon. McCord was dead at the scene, and D'Haeseleer, who was crouching on the floorboard, had been shot, possibly twice. D'Haeseleer was taken into custody briefly by the Smyrna police officers, taken to the hospital, and released the same morning.

Detectives M. Hicks and G. Ellison of the Cobb County Police Department and Captain W. Brack and Detectives M. Moore and K. Wrozier of the Smyrna Police Department conducted investigations of the incident. An autopsy was conducted and various evidence was delivered to the Georgia Bureau of Investigation for evaluation. The medical examiner determined that seven bullets inflicted eight wounds on McCord, two of which he identified as fatal. Both of these bullets were recovered; one was identified as a 9 mm bullet, the other could not be identified. It was not determined when the fatal shots were fired. In addition, a 40 mm bullet with traces of human blood was recovered from the cab of the truck, but the blood sample

was too small to permit typing. It has not been determined when McCord or D'Haeseleer suffered their various wounds or whether the wounds affected McCord's ability to control his truck during some portion of the pursuit.

By affidavits, the defendants have presented unrefuted evidence as to the counties' deadly force policies, training policies, specific training histories of the officers involved in the incident, and the investigation of the incident.

*Discussion*

*I. The Motions to Strike*

A. The Defendants' Motions to Strike

█ The Smyrna defendants have objected [71–1] to plaintiffs' use, in opposition to the motions for summary judgment, of the Cobb County Internal Affairs report, the reports and deposition transcripts of plaintiffs' experts, photographs of the truck, a diagram of the truck and various bullet holes, an unsworn letter from plaintiffs' expert to defense counsel, and a videotape of the examination of McCord's truck. The Cobb County defendants also have moved to strike [65–1] the letter from plaintiffs' expert to defense counsel.

In *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), the Supreme Court stated that a nonmoving party opposing a motion for summary judgment need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment. The Eleventh Circuit has interpreted *Celotex* as allowing otherwise admissible evidence to be submitted at the summary judgment stage in inadmissible form, including hearsay, unless the hearsay statement will not be available in admissible form at trial. *See McMillian v. Johnson,* 88 F.3d 1573, 1583–85 (11th Cir. 1996), *aff'd,* 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997).

The Cobb County Internal Affairs report contains the complete record of the investigation conducted by the Cobb County Police Department, including transcriptions of witness statements. The photographs, truck

diagram, and videotape of the truck examination similarly were prepared by certain defendants in the course of their investigation of this incident. There is no reason at this point to believe that the information contained in these documents would not be available in admissible form at trial.

The reports and deposition transcripts of plaintiffs' experts were prepared and produced pursuant to the requirements of the Federal Rules of Civil Procedure. The plaintiffs are likely to have the information contained in these statements available in admissible form at trial and, in any event, the defendants have had sufficient opportunity to point the Court to any deficiencies in these statements insofar as the issues relevant to the summary judgment motions are concerned.

The unsworn post-deposition letter, dated April 18, 1997, from plaintiffs' expert Fred Robinette III to defense counsel in large part merely reiterates information already contained in his deposition and report. In addition, however, Robinette's letter refers to information he was given that a witness, Joseph Simmons, gave statements to the police and to defense counsel that were highly critical of the police activities. The only statement by Simmons that appears in the record is the transcription of his interview by police investigators and is not corroborative of Robinette's characterization of Simmons' other alleged statements. Because it does not appear likely that plaintiffs will be able to present Robinette's hearsay statement as to Simmons' testimony in admissible form at trial, this Court will not consider Robinette's letter.

**B. The Plaintiffs' Motion to Strike**

Plaintiffs have moved to strike [72–1] the Smyrna defendants' reply brief in support of their motion to dismiss and accompanying notice of objections to plaintiffs' exhibits offered in opposition to the motions for summary judgment, on the ground that these were not timely filed.

Pursuant to a consent order entered on May 9, 1997, the Smyrna defendants had until May 16, 1997, to *serve* their reply brief. Similarly, under this Court's Local Rule 7.1(C), reply briefs must be *served* within the specified deadline. Although the Smyrna defendants' counsel misstated that the reply brief was served by hand delivery on May 16, plaintiffs have failed to establish that the brief was not properly served by United States mail on that date, as attested by counsel. *See* Fed.R.Civ.P. 5(b). Moreover, this Court has discretion under Local Rule 7.1(F) to consider the reply brief even if filed late.

*II. The Motions for Summary Judgment*

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In a case such as this, where the non-moving party will bear the burden of proof at trial, the movant may prevail by establishing that the non-moving party has no evidence to support an essential element of its case. *Young v. City of Augusta*, 59 F.3d 1160, 1170 (11th Cir. 1995).

**A. The Fourth Amendment Claims**

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated....

 A seizure occurs, within the meaning of the Fourth Amendment, when there is a governmental application of physical force or, where that is absent, a show of authority to which the subject yields. *See California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991). The Fourth Amendment addresses, however, only " 'misuse of power,' not the accidental effects of otherwise lawful government conduct." *Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989) (quoting *Byars v. United States*, 273 U.S. 28, 33, 47 S.Ct. 248, 250, 71 L.Ed. 520 (1927)).

Thus, if a parked and unoccupied police car slips its brake and pins a passerby against a wall, it is likely that a tort has occurred, but not a violation of the Fourth Amend-

ment. And the situation would not change if the passerby happened, by lucky chance, to be a serial murderer for whom there was an outstanding arrest warrant-even if, at the time he was thus pinned, he was in the process of running away from two pursuing constables. It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement through means intentionally applied.

489 U.S. at 596–97, 109 S.Ct. at 1381.

■■■ Applying this standard, McCord was seized when the officers' shots ended his flight. *See Menuel v. City of Atlanta,* 25 F.3d 990, 994–95 (11th Cir.1994) (intransigent suspect who yielded neither to physical force (none was applied until series of shots which proved fatal) nor to a show of authority was not seized until fatal shooting). D'Haeseleer, whose shooting was not the result of means intentionally applied to him, was seized within the meaning of the Fourth Amendment only when he was taken into custody after the pursuit had ended. *See Landol–Rivera v. Cruz Cosme,* 906 F.2d 791, 793–95 (1st Cir.1990) (hostage injured by police attempting to stop fleeing felon has not been "seized" and can assert no Fourth Amendment claim). The remaining issue, then, is whether such seizures were "unreasonable."

■■■ "Because '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,' ... its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (quoting *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60

L.Ed.2d 447 (1979)). The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with hindsight, and must allow for the fact that police officers are often forced to make judgments about the amount of force necessary in circumstances that are "tense, uncertain, and rapidly evolving." 490 U.S. at 396–97, 109 S.Ct. at 1872. Moreover, the officers' subjective intent as to the lawfulness of their actions is irrelevant. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them without regard to their underlying intent or motivation." 490 U.S. at 397, 109 S.Ct. at 1872.

In *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), which involved a fleeing felony suspect, the Supreme Court defined the circumstances in which an officer may reasonably employ deadly force.

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

471 U.S. at 11–12, 105 S.Ct. at 1701.

The Eleventh Circuit has interpreted the *Garner* standard as follows:

> First, an officer must have probable cause to believe that the suspect poses a threat of serious physical harm to the officer or to others. Probable cause of this sort exists where the suspect actually threatens the officer with a weapon or where there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm. Second, deadly force must be necessary to prevent escape. Third, the officer must give some warning regard-

ing the possible use of deadly force whenever feasible.

*Acoff v. Abston,* 762 F.2d 1543, 1547 (11th Cir.1985).

At the time shots were fired at Spring Road, McCord's truck had collided with Harrison's patrol car and struck Burkhart. Moments later, McCord's truck drove toward Harrison a second time, when shots were fired again. Even if McCord had no conscious intent to assault or batter these officers, but was merely trying to reposition his car for escape, it was not objectively unreasonable for the officers at the scene to believe at that point that they were responding to an aggravated assault or an aggravated battery against police officers, felonies under Georgia law. *See* O.C.G.A. §§ 16–5–21, 16–5–24. At Windy Hill Road, Liber believed that McCord was dragging Noles with his truck and that he was aiming his truck at Noles or other officers. Chastain and Noles believed that McCord was driving in a manner intended to injure them and other officers. Again, it was not objectively unreasonable for these officers to believe that McCord had committed an aggravated assault or battery on Noles and that he would continue to assault other officers.

Second, deadly force was necessary to prevent McCord's escape even after the truck appeared finally to have stopped. He had appeared to stop in response to Noles' lights and siren, and to being partially boxed in by patrol cars, but each time then moved to escape by driving his truck in a manner that threatened officers on foot and in their patrol cars.

Finally, it was not feasible to give any warning of the possible use of deadly force other than the shots initially fired at the Spring Road scene. McCord would not permit the officers to get close to his truck and the events unfolded in so quick and deadly a manner that the officers had no other opportunity to give McCord warning.

In light of these facts, the use of deadly force against McCord was not constitutionally unreasonable. *Cf. Cole v. Bone,* 993 F.2d 1328 (8th Cir.1993); *Smith v. Freland,* 954 F.2d 343 (6th Cir.), *cert. denied,* 504 U.S. 915, 112 S.Ct. 1954, 118 L.Ed.2d 557 (1992).

D'Haeseleer does not contend that his short-term seizure after the truck stopped was unreasonable. Because there was no fourth amendment violation, it is not necessary to determine whether the officers involved are entitled to qualified immunity.

**B. The Derivative § 1983 Claims**

■ McCord and D'Haeseleer assert claims under 42 U.S.C. § 1983 based on the allegations that the municipalities' deadly-force policies, failure to train, and failure to supervise caused the Fourth Amendment violations.

■ In order to prevail on a § 1983 claim, the plaintiffs must show that: (1) the conduct complained of was committed by a person acting under the color of state law, and (2) the conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Burch v. Apalachee Community Mental Health Services, Inc.,* 840 F.2d 797, 800 (11th Cir.1988), *aff'd by Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).

Because McCord and D'Haeseleer were not deprived of their rights under the Fourth Amendment to be free from unreasonable seizures, the § 1983 claims must fail. *See, e.g., City of Los Angeles v. Heller,* 475 U.S. 796, 798–99, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) (if the arrestee has suffered no constitutional injury at the hands of a police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is irrelevant); *Rooney v. Watson,* 101 F.3d 1378, 1381–82 (11th Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997) (no actionable claim for unconstitutional municipal policy or failure to train where there has been no constitutional violation).

**C. The Conspiracy Claims**

■ Plaintiffs claim that the investigating officers, Hicks, Ellison, Moore, Wrozier, and

Brack conspired to cover up the unlawful acts of the officers at the scene, thus obstructing justice in violation of 42 U.S.C. §§ 1983 and 1985(2). It is not clear from Plaintiffs' responses to the motions for summary judgment whether they contend the named defendants violated the first or the second clause of § 1985(2).

Section 1985(2) provides:

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws; ...

the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

▬▬▬ To establish a civil conspiracy under §§ 1983 or 1985, the plaintiffs must present evidence that the defendants acted in concert and that some overt act was done in furtherance of the conspiracy which resulted in the plaintiffs' deprivation of a constitutional right. *Hinkle v. City of Clarksburg,* 81 F.3d 416, 421–23 & n. 4 (4th Cir.1996). While the plaintiffs need not produce direct evidence of a meeting of the minds, they must come forward with specific circumstantial evidence that each member of the alleged

conspiracy shared the same conspiratorial objective to obstruct the plaintiffs' access to the courts; mere speculation and conjecture will not suffice. *Id.,* at 421–23; *see also Gometz v. Culwell,* 850 F.2d 461, 463–64 (8th Cir.1988); *Bell v. City of Milwaukee,* 746 F.2d 1205, 1254–58 (7th Cir.1984) (finding sufficient evidence that investigator and supervisor withheld from superiors and victim's family material discrepancies in information revealed by investigation). *Cf. Arnold v. Board of Education of Escambia Co.,* 880 F.2d 305, 317–18 (11th Cir.1989) (detailing necessity, in opposing motion to dismiss under Fed.R.Civ.P. 12(b)(6), of alleging specific facts from which conspiracy may be inferred).

Here, the plaintiffs' allegations in support of the conspiracy claim amount to nothing more than speculation. For example, the plaintiffs allege impropriety in the failure to conduct ballistics tests to determine which bullets caused McCord's death. But the undisputed evidence is that ballistics tests were conducted by the Georgia Bureau of Investigation, but they were inconclusive. Similarly, the undisputed evidence is that the Georgia Bureau of Investigation failed to conduct blood-typing tests on the 40 mm bullet found in the truck because the blood sample was too small to permit such testing rather than out of any motive to protect the shooter. Nor do minor discrepancies in officers' testimony about their locations when shots were fired amount to evidence of a conspiracy. To the contrary, the existence of the discrepancies and the investigators' inclusion in their reports of both the investigators' summaries and transcribed interviews from which any discrepancies could be discerned are indicative of a lack of agreement to cover up facts about the incident.

The first clause of § 1985(2) prohibits conspiracies directed only toward interference with specific activities in federal court. Plaintiffs have alleged no conspiracy to deter parties or witnesses "by force, intimidation, or threat" or to "injure" any party or witness for having attended court or testified. Nor do they allege a conspiracy to influence a juror in federal court. Thus, they do not

allege, or present evidence of, a conspiracy prohibited by the first clause of § 1985(2).

 In addition, the second clause of § 1985(2) creates a private cause of action only against those who conspire to obstruct justice in state proceedings with the intent to deny to any citizen the equal protections of the laws. 42 U.S.C. § 1985(2). To be viable, a claim under the second clause of § 1985(2) must allege that invidiously discriminatory animus motivated the defendants. *Slavin v. Curry,* 574 F.2d 1256, 1262 (5th Cir.), *modified on other grounds,* 583 F.2d 779 (5th Cir.1978), *overruled on other grounds sub nom Sparks v. Duval County Ranch Co., Inc.,* 604 F.2d 976 (5th Cir.1979); *see also Kush v. Rutledge,* 460 U.S. 719, 724–27, 103 S.Ct. 1483, 1486–88, 75 L.Ed.2d 413 (1983).

In *Slavin,* the Eleventh Circuit applied to § 1985(2) cases the Supreme Court's holding that § 1985(3), whose language is very similar, requires some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' conduct. *See* 574 F.2d at 1262. Although the Supreme Court has hinted that this requirement may be satisfied by something other than racial animus, it "unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 268–69, 113 S.Ct. 753, 759, 122 L.Ed.2d 34 (1993).

The plaintiffs have presented no evidence of racial or class-based discrimination, nor have they even alleged such discrimination. They have alleged only that the defendants conspired to cover up their own allegedly illegal activities out of self-interest, an insufficient basis on which to predicate liability.

### D. The State Law Claims

 The Smyrna defendants contend that, if the federal claims are dismissed, this Court should decline to exercise supplemental jurisdiction over the pendent state law claims.

Pursuant to 28 U.S.C. § 1367(a), in any civil action in which a federal district court has original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the Constitution. Pursuant to § 1367(c), however, a district court may decline to exercise such supplemental jurisdiction if the district court has dismissed all claims over which it had original jurisdiction.

 In *Palmer v. Hospital Authority of Randolph Co.,* 22 F.3d 1559, 1569 (11th Cir.1994), the Eleventh Circuit held that whenever a federal court has supplemental jurisdiction under section 1367(a) that jurisdiction should be exercised unless section 1367(b) or (c) applies. When subsection (c) permits a court to decline to exercise its jurisdiction, the court's discretion should be guided by the factors described in *United Mine Workers v. Gibbs,* 383 U.S. 715, 725–27, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966): judicial economy, convenience, fairness to the parties, and comity. 22 F.3d at 1569. Typically, where federal claims are dismissed before trial, these factors will favor dismissal of the state claims. *See, e.g., Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988); *United Mine Workers,* 383 U.S. at 726, 86 S.Ct. at 1139; *Baggett v. First National Bank of Gainesville,* 117 F.3d 1342, 1352–53 (11th Cir.1997).

This Court finds that the state law claims remaining in this action are best resolved by the Georgia state courts. The remaining claims raise issues of state law only, including state law regarding sovereign and official immunity, that do not implicate federal interests in any manner. Because 28 U.S.C. § 1367(d) tolls the state statute of limitations, there is no unfairness to plaintiffs resulting from dismissal.

For the foregoing reasons:

1. Plaintiffs' construed motion for leave to amend the complaint to delete the Fourteenth Amendment claims against the officers at the scene of the shooting, and the Fifth Amendment claims is GRANTED.

2. Defendants' motions to strike [65–1, 71–1] are GRANTED IN PART as to Robinette's April 18, 1997, letter to defense counsel (Exhibit F to Plaintiffs' responses in opposition to the motions for summary judgment) but DENIED in all other respects,

3. Plaintiffs' motion to strike [72–1] is DENIED,

4. Defendants' motions for summary judgment [54–1, 55–1] are GRANTED as to all federal claims, and

5. Plaintiffs' state law claims are DISMISSED WITHOUT PREJUDICE.

The Clerk is directed to enter final judgment in favor of defendants on plaintiffs' remaining claims under federal law. The Clerk is directed to dismiss plaintiffs' claims under state law.