[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-12003

_____

D.C. Docket No. 1:05-cv-00125-LGW-WLB

LEE JOHNSON

Plaintiff-Appellee,

versus

MICHAEL NIEHUS,
MICHAEL HUMPHREYS,

Defendants-Appellants,

RACHEL HARDIN,
et al.,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(October 16, 2012)

Before JORDAN and FAY, Circuit Judges, and HOOD,[*] District Judge.

PER CURIAM:

Defendants-Appellants Michael Niehus and Michael Humphreys filed this interlocutory appeal following the district court's denial of qualified immunity. Plaintiff-Appellee Lee Johnson alleges that Officers Niehus and Humphreys used excessive force, thereby violating Johnson's Fourth Amendment rights in violation of 42 U.S.C. § 1983.  For the following reasons, we REVERSE the district court's decision.

## I.

The parties agree that Johnson ignored police officers' commands during a traffic stop, that he pleaded guilty to aggravated assault, and that he was shot.  The parties agree on very little else.  The physical evidence in the record only supports the facts as stated by the officers on the scene as opposed to Johnson's inconsistent testimony. Consequently, we give serious consideration to whether Johnson demonstrated any "genuine" issues of material fact.  As described below, we conclude that Johnson's testimony, without more, cannot create a genuine issue of material fact where the physical and other evidence so strongly contradicts

---

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

his statements.  Thus, the version of facts provided by the officers and confirmed by the physical evidence is the lens through which we will view the reasonableness of the officers' actions.

Appellant Michael Niehus, a Richmond County Sheriff's Deputy, testified in his deposition that while sitting in his patrol car at the intersection of Wylds Road and Milledgeville Road in Augusta, Georgia on the night of October 22, 2004, he observed a black vehicle driven by Appellee Lee Johnson speeding down Milledgeville toward Wheeless Road.  The car had a paper tag and was going approximately 15 miles per hour over the speed limit.  Niehus turned onto Milledgeville Road to catch up to the vehicle, but he soon lost sight of the car. Once Niehus reached the intersection of Milledgeville and Wheeless, however, he noticed that the vehicle had pulled into the parking lot of the convenience store on the right side of the road.  The car was parked close to the building, which Niehus interpreted as an apparent effort to elude him.  Niehus radioed Defendants Michael Humphreys and Rachael Hardin, Richmond County Deputy Sheriffs patrolling nearby in Humphreys' car, for assistance.  From the Wheeless Road intersection, Humphreys and Hardin testified they saw Johnson walk quickly from behind the convenience store where he had parked and look in both directions up and down the road, as though he was attempting to observe where Deputy Niehus had

3

driven.  While Johnson admits that he was aware of the officers' presence, he contends that he merely pulled his car into a nearby convenience store to use a pay phone to call his nephew, who did not answer.  The officers observed Johnson hurriedly return to his car and, several moments later, turn on to Wheeless Road and begin speeding.  Humphreys and Hardin followed in their patrol cars.  After Humphreys turned his vehicle's lights on to initiate a traffic stop, Johnson slammed on his brakes, almost causing Humphreys to rear-end the other vehicle.  Johnson testified that he panicked and took off when the officers initiated the stop because he was on probation, and had an open container in the car.  Johnson then drove forward and abruptly turned into a driveway at 2315 Wheeless Road.  While the testimony and physical evidence, including tire tracks and bullet casings, prove that the incident happened at this address, Johnson claimed that the stop and the incident that followed occurred on Milledgeville road.

Humphreys and Hardin exited the patrol car and approached the vehicle; Humphreys approached from the driver's side and Hardin from the passenger's side.  Contrary to the officers' account, Johnson contends that as soon as he stopped, the three officers rushed up to the sides of his car with their weapons drawn.  He claims that they immediately began hitting on the window and pulling on the door latches.  However, Humphreys and Hardin testified that upon reaching

4

the driver's side of the vehicle, Humphreys asked to see Johnson's driver's license. Johnson acted as if he didn't hear or didn't understand Humphreys' request. Humphreys noticed Johnson fidgeting with his hands and trying to keep his hands from view. Humphreys then asked Johnson to put his hands on the steering wheel. Niehus arrived on the scene shortly thereafter and pulled into the driveway behind the other patrol car. From where Niehus was positioned at the rear of the vehicle on the driver's side, looking through the rear window with his flashlight, he could see the driver's clinched right hand moving from the steering wheel to his right leg. Humphreys and Hardin, who positioned herself close to the vehicle on the passenger side towards the backseat, noticed that Johnson was trying to hide what appeared to be a bag of cocaine with his right hand by his right leg.

Humphreys continued to order the driver to place his hands on the steering wheel. When Johnson finally put his hands on the steering wheel, the only command that he complied with throughout the stop, there was a bag sticking out of the back of his fist which appeared to contain marijuana. The bag appearing to contain cocaine was visible on the seat of the vehicle. Johnson, when asked about the drugs by Humphreys, continued to pretend like he didn't understand or couldn't hear what Humphreys was saying. Johnson later testified that he did not

5

have drugs in the vehicle with him.[1]  Instead, he claimed that what the officers'

saw in his hand was only a tissue paper.   Despite Humphreys' repeated

commands, Johnson refused to  turn off the engine, provide his driver's license or

step out of the vehicle.  Johnson admits that he sat in the driver's seat, ignoring the

officers' requests to turn off the motor and exit the vehicle, for at least two

minutes.  As Humphreys was trying to get Johnson to comply, Hardin saw an

opportunity to reach in through the open or partially open rear passenger window

to unlock the vehicle.  Unable to find the lock, Hardin pulled her upper torso

through the open window into the car to have better access.  By this time, Johnson

was revving the engine of the car.  Humphreys, realizing that Hardin's torso was

in the vehicle, and recognizing that Johnson might be trying to put the car into

reverse, also tried to reach in the car through the open driver's window to turn the

vehicle off.  Instead of complying with Humphreys' commands, Johnson began

rolling up his partially cracked window while also trying to move the gear shift to

put the car into reverse.  Humphreys tried to keep the window from rolling up by

pushing down on the window with his fingers.  Suddenly, Johnson put the car in

---

[1]  A subsequent search of the vehicle revealed a can of beer and a bottle of brandy, but no bags of cocaine or marijuana were found.  While Johnson denied taking any drugs before the incident, a blood test at the hospital was positive for cocaine and THC.

6

reverse and stomped the gas, spinning the tires and slinging gravel from the driveway.

Johnson, by contrast, testified that the car was stationary as the officers continued their assault on the vehicle until one of the male officers said "just shoot him." Johnson saw a flash of light and felt a bullet, fired by the officer to his left, strike his left arm. Only then, Johnson testified, did he put his car into reverse.

Humphreys was dragged momentarily while he tried to pull his fingers free of the window. Deputy Hardin was thrown back by the car's sudden movement, losing her balance and almost falling. Niehus, who had been standing at the rear of the vehicle, found himself in the direct path of the vehicle as the driver accelerated backwards. Niehus avoided being hit by jumping out of the way of the moving vehicle. After passing Niehus, Johnson's car struck the front of Humphreys' vehicle, as evidenced by tire tracks and paint transfers and damage to the vehicles, as well as the officers' testimony.

Johnson then placed his car in drive and accelerated forward, executing a variation of a three-point turn, and once again headed straight toward Niehus. The tire tracks left at the scene confirm that Johnson drove his vehicle back and forth in this fashion. Humphreys also found himself in the path of the speeding vehicle but avoided being struck by quickly moving to his right. Humphreys saw that the

7

vehicle was still barreling down on Niehus, so he shouted to Deputy Niehus to fire his weapon or to get out of the way.  Fearing for their lives, Humphreys and Niehus fired their weapons almost simultaneously.  Hardin testified that she thought Johnson would hit Humphreys and Niehus.  She, too, raised her gun but found Humphreys in her line of fire.  Niehus testified that he decided to shoot as the vehicle was still driving directly towards him but that, by the time he actually fired, the vehicle had pulled past him.  The driver's side door was even with, or just past, Niehus at the time he fired.  Niehus recalled firing one shot from his service weapon, causing the front driver's side window to shatter as the car narrowly missed hitting him.  Humphreys also fired his service weapon.  A later examination of the Johnson's vehicle revealed that it had been shot through the left rear corner.

In stark contrast to the events testified to by the officers and confirmed by the tire tracks left by his vehicle, Johnson claims that did not move the car until he was shot.  Only then, terrified, Johnson claims he backed out of the yard and back onto Milledgeville Road.  Johnson denies maneuvering forward and around the police vehicles and fence, as the deputy sheriffs allege.  Instead, Johnson claims that he had turned to look behind him through the back of the car.  Despite being shot in the left arm, he claims that he was steering with his left arm and he turned

8

to look behind him.  As he describes the scene, he was not blocked in and was able to back out without hitting either of the cars or having to go back and forth.

The car continued out of the driveway and turned left on Wheeless Road, back toward Milledgeville Road, narrowly missing a vehicle traveling on Wheeless Road.  Only a few seconds passed between the time Johnson first accelerated backwards until he escaped on Wheeless Road.  All of the officers quickly returned to their respective patrol cars to pursue the vehicle. Both patrol cars lost sight of the vehicle at some point during the pursuit, but Niehus eventually caught up when Johnson pulled into a field on Old McDuffie Road. Johnson exited his vehicle, and began fleeing on foot, eventually becoming entangled in a briar patch.  Niehus chased after the driver.  Deputy Humphreys arrived on the scene and, after a brief struggle, helped Niehus handcuff the driver. The officers noticed Johnson had been shot and immediately called for an ambulance.

Johnson was later indicted on three counts of aggravated assault for putting the lives of Niehus, Humphreys and Hardin at risk when trying to escape the scene.  On October 10, 2007,  in a negotiated plea, Johnson pleaded guilty to the first two counts regarding Officers Niehus and Humphreys.  In his plea he admitted that he assaulted the officers, knowing that they were peace officers, by

9

"rapidly accelerating a motor vehicle driven by the accused towards [the officers] and almost striking [them]."

## II.

This Court possesses limited jurisdiction over an interlocutory appeal of the denial of qualified immunity. 28 U.S.C. § 1291; Koch v. Rugg, 221 F.3d 1283, 1294-95 (11th Cir. 2000). Because this matter turns on legal questions, as described below, interlocutory appeal is proper. Johnson v. Jones, 515 U.S. 304, 312 (1995); Scott v. Harris, 550 U.S. 372, 380 (2007).

We review de novo the district court's grant of summary judgment. Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002)). "Summary judgment is appropriately granted if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Id. (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)). Generally, we view the evidence in the light most favorable to the non-moving party and adopt the non-movant's version of the facts, id., but we do so "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). While "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial," Anderson, 477 U.S. at 249, "[w]hen opposing parties tell

10

two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for ruling on a motion for summary judgment." Scott, 550 U.S. at 380 (finding that the court could not rely on plaintiff's "visible fiction" where a video tape of the police chase discredited plaintiff's testimony that there was little, if any, threat to pedestrians and motorists).

More to the point, a motion's "opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott, 550 U.S. at 380 (quoting Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)) (internal quotations omitted). At the summary judgment stage, a nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." Jeffreys v. City of New York, 426 F.3d 549, 554 (2nd Cir. 2005) (citing D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir.1998)). "[T]he judge must ask ... not whether ... the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Anderson, 477 U.S. at 252.  "If evidence is merely colorable, or is not significantly probative, summary judgment may be granted."

11

Id. at 249-50 (internal citations omitted).  "A mere scintilla of evidence in support of the non-movant is insufficient to defeat a motion for summary judgment." Kesinger v. Herrington, 381 F.3d 1243, 1249-50  (11th Cir. 2004) (citing Anderson, 477 U.S. at 252).

In Kesinger, which presented this Court with similar issues, a police officer driving to work encountered a deranged man in the middle of the highway.  Id. at 1246.  When the officer tried to encourage Kesinger to move to a safe area, Kesinger turned on the officer and began a vituperative tirade, culminating with the statement, "I am going to die and so are you!"  Id. at 1246. The officer retreated to his vehicle, but Kesinger pursued, first attacking and breaking the rear window of the unmarked police car and then breaking the driver's side window. Id. at 1246. Believing that the breaking window was the sound of Kesinger shooting at him, the officer shot Kesinger through the driver's side window, killing him.

One witness, a driver on the interstate that day, testified that Kesinger was shot after he ceased attacking the vehicle.  Id. at 1247.  Kesinger had taken a few steps away from the vehicle and was trying to catch his breath when, according to this witness, the door of the car opened and the officer shot through the open door. Id. at 1247.  The physical evidence, however, showed that Kesinger was

12

immediately outside of the vehicle when shot, that his body was so close to the car that his feet were under the vehicle, that the bullet had exited the through the window of the vehicle, and that Kesinger's blood was on the driver's side of the car. Id. at 1247. Thus, the physical evidence demonstrated that Kesinger was still actively attacking the officer's vehicle when the officer fired from within. Because the testimony of the witness was in direct conflict with the testimony of the other witnesses and the physical evidence, this Court found that it was not substantial evidence and disregarded it for purposes of determining whether there was a genuine issue of material fact. Id. at 1249-50.

In the matter before us, similarly, we cannot reconcile the account given by Johnson with the conclusions to be drawn from the physical evidence found at the scene – evidence which corroborates the defendant officers' accounts of what happened during the incident. Nor do we believe that fair minded jurors would see the matter differently. Johnson has testified that he simply placed the car in reverse, never making any forward movement as he tried to flee, and backed down the driveway and into the street. He avers that he was shot as he ignored the officers' directions and while his vehicle was stationary. Yet, his version of events does not account for the tire tracks and paint transfer between vehicles, and the placement of the shell casings which tell the same tale as reported by the

13

officers on the scene:  (1) that Johnson maneuvered back and forth in a three point turn which took him toward and past police officers, police vehicles, and fences on the private property where the initial stop took place, and (2) that Johnson was shot only after he had used his car to assault or threaten the assault of officers Niehaus and Humphreys.  Johnson also pled guilty to aggravated battery, admitting that he drove his car at the officers and almost struck them.

Johnson makes no effort to reconcile the physical evidence of the action at the scene with his fanciful account, nearly every element of which is blatantly contradicted by the evidence in the record, and we conclude that no fair-minded jury could return a verdict for Johnson on the evidence in the record before us. Further, we are not obliged to cherry pick facts from his story which support his version of the events and which can be reconciled with the otherwise undisputed evidence, and we decline to do so.  Instead, we conclude that the district court erred when it adopted Johnson's version of the facts solely because he was the nonmovant in light of the inconsistencies set forth above.  We analyze the officers' claim of qualified immunity in light of the facts supported by the record, which are those set forth by the defendants in this matter.

III.

Considering the facts in light of the physical evidence in the record and the officers' accounts, we now turn to whether the defendants are entitled to qualified immunity.  "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The parties do not dispute that Niehus and Humphreys were acting within the scope of their discretionary authority during the incident, the threshold question in a qualified immunity inquiry.  Id.  Thus, the burden shifts to Johnson to show that the officers are not entitled to qualified immunity.  Id.  Johnson must first show that the officers violated Johnson's constitutional rights and, second, that the rights involved were "clearly established" at the time of the alleged misconduct. Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012); Pearson v. Callahan, 555 U.S. 223, 232 (2009).

Johnson argues that the use of deadly force by Niehus and Humphreys amounts to excessive force in violation of Johnson's constitutional rights.  "[A]ll claims that law enforcement officers have used excessive force – deadly or not –

15

in the course of an arrest, investigatory stop or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395 (1989); see Terrell, 668 F.3d at 1250. An officer is entitled to qualified immunity if his actions were objectively reasonable, meaning that "an objectively reasonable officer in the same situation could have believed that the force used was not excessive." Vinyard, 311 F.3d at 1346 (citing Anderson v. Creighton, 483 U.S. 635, 638-41 (1987)). "In determining the reasonableness of the force applied, we look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." McCollough v. Antolini, 559 F.3d 1201, 1206 (11th Cir. 2009).

"[A]n officer may use deadly force to stop a fleeing felony suspect when the officer: (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible." Id. (internal quotations omitted) (quoting Vaughan v. Cox, 343 F.3d

16

1323, 1329-30 (11th Cir. 2003)).  "Although this list of factors may be relevant in assessing the reasonableness of using deadly force, 'in the end we must still slosh our way through the factbound morass of 'reasonableness.' " Terrell, 668 F.3d at 1251 (quoting Scott, 550 U.S. at 383).

In Terrell, similarly to the case at bar, the initial stop was for a misdemeanor traffic violation - failure to illuminate the lights of the vehicle at night.  Terrell, 668 F.3d at 1251-52.  Fazio, one occupant of the car, complied with the officers' commands to exit the vehicle, kneel and raise his hands.  Id. at 1252. Another occupant, Zylstra, exited the car, only to turn back around, jump in the car and begin driving away, despite the officers' directions to stop.  Id.  At that time, the officers had probable cause to believe that Zylstra committed a felony under Florida law by refusing or failing to stop a vehicle.  Id. at 1252.  Zylstra continued to drive the vehicle, striking a police officer and placing another officer and Fazio, who was still kneeling on the ground, at risk.  Zylstra was shot twice and killed. Id. at 1249. We determined that the officer's use of deadly force in that instance was reasonable because Zylstra "turned the car in a dangerous and aggressive manner which provided the officers with probable cause to believe that Zylstra ... posed a threat of serious physical harm or death to the officers, or other passersby, especially in light of the speed with which the incident unfolded" and, thus, the

17

officers did not violate Zylstra's Fourth Amendment rights. Id. at 1254-55 (quoting McCullough, 559 F.3d at 1208) (internal quotations omitted).

Arguably, the officers in the matter before us had probable cause to believe that Johnson committed aggravated assault in violation of O.C.G.A. § 16-5-21, a felony under Georgia law, Puglise v. Cobb Cnty., 4 F.Supp.2d 1172, 1180 (N.D.Ga 1998), when Johnson first revved his engine and then threw the car into reverse, forcing the officers to back away from the vehicle. They certainly had probable cause once Johnson placed his vehicle in reverse and almost backed over Officer Niehus the first time. At the time the officers fired, Niehus had dodged Johnson's vehicle twice to avoid being hit or penned against another object by the vehicle. Niehus and Humphreys warned Johnson to stop the vehicle prior to discharging their weapons and reasonably believed, when they fired their weapons, that the officers were in grave danger. "We have ... consistently upheld an officer's use of force and granted qualified immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." McCullough, 559 F.3d at 1207-08 (finding use of deadly force justified where "in a split-second situation where a suspect late at night refused to pull over, engaged in a high-speed chase, and then, after pulling over, repeatedly refused to show his hands or

18

respond to officers, revved his engine, and then drove his truck toward the deputy standing in a nearby lot"); see also Pace v. Capobianco, 284 F.3d 1275, 1282 (11th Cir. 2002) (finding deadly force constitutional under the circumstances because the decedent would have appeared to have been gravely dangerous based on his hazardous driving during a car chase, and failure to heed police warning); Robinson v. Arrugueta, 415 F.3d 1252, 1255-56 (11th Cir. 2005) (finding that officer was entitled to qualified immunity where officer used deadly force against suspect driving a vehicle that was advancing towards officer at one to two miles per hour); Terrell, 668 F.3d at 1254-55.

That Johnson's vehicle had already started to pull past Niehus at the time he fired is of no consequence to this analysis. "Even if in hindsight the facts show that [the officer] perhaps could have escaped unharmed," an objectively reasonable law enforcement officer could well have perceived that Johnson's vehicle was being used as a deadly weapon, especially after the driver had been repeatedly ordered to stop. See Terrell, 668 F.3d at 1255 (quoting Robinson, 415 F.3d at 1256); see also Montoute v. Carr, 114 F.3d 181, 185 (11th Cir. 1997) ("[A]n officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force."); Pace, 283 F.3d at 1280, n. 12 ("[U]nder the law, the threat of danger to be assessed is not just the

19

threat to officers at the moment, but also to the officers and other persons if the chase went on."); Long v. Slaton, 508 F.3d 576 (11th Cir. 2007) ("Although at the point of the shooting Long had not yet used the police cruiser as a deadly weapon, Long's unstable frame of mind, energetic evasion of the deputy's physical control, Long's criminal act of stealing a police cruiser, and Long's starting to drive—even after being warned of deadly force—to a public road gave the deputy reason to believe that Long was dangerous.").

The officers had every reason to believe that Johnson was endangering them as well as any passersby. Considering Johnson's behavior to that point, specifically that he ignored repeated commands by the officers, tried to roll up the windows while the officers were in harm's way, revved the engine and threw the car into reverse while the officers' arms and hands were in the vehicle, and that he tried to flee by driving forward and backwards, in a dangerous manner endangering the three officers that were around the vehicle, an objectively reasonable officer would have known that Johnson could throw the car into reverse or turn around at any point, thereby continuing his assault on the officers. While, in retrospect, it may appear that Johnson's aggressive maneuvers were over after he pulled past Niehus, the officers, who were "forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving– about

20

the amount of force that is necessary in a particular situation" would not have known that. Graham, 490 U.S. at 396-97. We do not judge the officers' conduct with "20/20 vision of hindsight," but rather "from the perspective of a reasonable officer on the scene." Graham, 490 U.S. at 396. Thus, we conclude that the use of lethal force was objectively reasonable under these circumstances.

It follows that Johnson's constitutional rights were not violated, and we need not address whether the right was clearly established at the time. Vinyard, 311 F.3d at 1346. Likewise, we need not address Appellants' argument that Heck v. Humphrey, 512 U.S. 477 (1984) bars Johnson's claims.

## IV.

In conclusion, there were no genuine issues of material fact precluding summary judgment and, viewing the record as a whole, the actions of Niehus and Humphreys did not violate Johnson's Fourth Amendment rights. Accordingly, we **REVERSE** and **REMAND** with instructions that summary judgment be entered in favor of the Defendants-Appellants.