EH, a minor through his legal guardian, Shonteaka MOORE; and HH, a minor through his legal guardian, Cynthia Stimphil; Philocles Hilaire, as personal representative of the estate of Herson Hilaire and Hedson Hilaire; Philocles Hilaire, an individual and father of Herson Hilaire and Hedson Hilaire; and Marguerite W. Hilaire, an individual and mother of Herson Hilaire and Hedson Hilaire, Plaintiffs,

v.

CITY OF MIRAMAR, a municipality; Marc Moretti, Damaso Espiritusanto, Bosco Neuhaus, and Michael Bolduc, Defendants.

Case No. 13–60235–CIV.

United States District Court, S.D. Florida.

Signed June 19, 2015.

---

Greg McNeill Lauer, Christina Marie Currie, Lauer & Currie, P.A., Fort Lauderdale, FL, for Plaintiffs.

Justin Daniel Luger, John Joseph Quick, Wiess Serota Helfman Pastoriza Cole & Boniske P.L., Coral Gables, FL, Daniel Lawrence Abbott, Weiss Serota Helfman Cole Bierman & Popok, P.L., Ft. Lauderdale, FL, for Defendants.

## *ORDER*

WILLIAM J. ZLOCH, District Judge.

THIS MATTER is before the Court upon the Report And Recommendation (DE 99), filed herein by United States Magistrate Judge Patrick M. Hunt, Defendants' Motion For Summary Judgment (DE 73), and Plaintiffs' Objections To Report And Recommendation As To Defendants' Motion For Summary Judgment (DE 103). The Court has conducted a *de novo* review of the entire record herein and is otherwise fully advised in the premises.

In his Report (DE 99), Magistrate Judge Patrick M. Hunt recommends that the Court grant Defendants' Motion For Summary Judgment (DE 73) as to all Defendants and that the state law wrongful death claim be dismissed. DE 99, p. 35. object to the findings in Magistrate Judge Hunt's Report (DE 99) because, according to Plaintiffs, the findings in said Report are the result of Magistrate Judge Hunt's failure to apply the appropriate summary judgment standard by improperly crediting Defendants' facts, while simultaneously dismissing the Plaintiffs' facts and any in-

ferences properly drawn therefrom. DE 103, p. 5. Therefore, Plaintiffs maintain that said Report is based on a faulty foundation, leading to an incorrect result. However, the Court finds that Magistrate Judge Hunt properly evaluated and credited both the facts and the record evidence, in conformity with the appropriate summary judgment standard, and adopts the findings of Magistrate Judge Hunt in his Report and Recommendation (DE 99).

Contrary to the allegations made by Plaintiffs' Objections (DE 103), Magistrate Judge Hunt correctly articulates and applies the summary judgment standard in his Report and Recommendation. *See* DE 99, pp. 12–13. In addition to what was discussed in Magistrate Judge Hunt's Report (DE 99), this Court also notes that, "[b]y its very terms, [the summary judgement] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–8, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

In determining whether a fact is *material*, "the substantive law will identify which facts are material ... [therefore, o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment [and] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

In determining whether a factual dispute is *genuine*, the Court must determine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In performing this inquiry, "[i]f the evidence is merely colorable, ... or is not significantly probative, ... summary judgment may be granted." *Id.* at

249–50, 106 S.Ct. 2505. The following tenet guides this inquiry:

The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.

*Id.* at 252, 106 S.Ct. 2505 (internal quotations omitted).

■ Thus, the summary judgment standard necessarily requires the court to "view the evidence presented through the prism of the substantive evidentiary burden." *Anderson,* 477 U.S. at 254, 106 S.Ct. 2505. In sum, the inquiry at hand "is whether a jury could reasonably find either that the plaintiff proved his case *by the quality and quantity of evidence* required by the governing law or that he did not." *Id.* (emphasis added). Therefore, the Court's determination hinges on whether the factual disputes alleged are both genuine and material.

In their Objections (DE 103), Plaintiffs' argue, without supporting case law, that:

The only way to properly analyze this case for qualified immunity purposes is to break it down into what it is: Three separate and distinct applications of deadly force by the four officers involved and with each application of deadly force being separated by time, physical distance and specific factual scenarios.

DE 103, p. 2. Notably, neither Plaintiffs' Response To Defendants' Motion For Summary Judgement (DE 78) nor their Objections (DE 103) cite any case law in support of this proposition.

To the contrary, there are several cases in this Circuit that support the proposition that the use of deadly force is reasonable until the threat of serious physical harm was eliminated and the threat was fully secured. *See Clark v. City of Atlanta,* 544 Fed.Appx. 848, 857 (11th Cir.2013) (granting summary judgment in favor of the officer because he "acted reasonably in continuing to shoot at [decedent] until the threat of serious physical harm was eliminated and [decedent] was fully secured"); *see also Jean–Baptiste v. Gutierrez,* 627 F.3d 816 (11th Cir.2010); *Martinez v. Halabi,* 2012 WL 222069, *5 (S.D.Fla. Jan. 25, 2012); *Humphrey v. City of Headland,* 2012 WL 2568206, *4 (M.D.Ala. July 2, 2012).

Plaintiffs contend that the following findings by Magistrate Judge Hunt are erroneous: (1) the events of the evening were fluid, (2) the responding officers did not know whether the Decedents were armed, (3) that there was no inherent contradiction between the statements of the Defendant officers and witness Dustin Nicol, and (4) Plaintiffs misstated certain facts. Each of these facts will be addressed in turn.

In his Report (DE 99), Magistrate Judge Hunt concluded that the "events of the evening were fluid. There were no temporal lapses or pauses." DE 99, p. 22. Plaintiffs argue that "[t]he term 'temporal' ... is problematic as it refers only to time" and that "[t]he reason why this shooting needs to be evaluated as three separate applications of deadly force is not simply of the time that elapsed between each application of deadly force but also the dramatic change in circumstances between [them]." DE 103, p. 7.

The Court finds that Plaintiffs' Objection to this factual finding is not well taken, as there is no case law or other authority supporting the proposition that applications of deadly force should be divided into stages. Further, Plaintiffs altogether fail to support the assertion that the threat of serious physical harm was eliminated or that the existing threat was fully secured. In any event, whether the events were fluid or instead divided into stages is not material to the substantive issue of qualified immunity in the above-styled cause.

Second, Plaintiffs disagree with Magistrate Judge Hunt's conclusion in Footnote 9 of his Report (DE 99) that Defendants were not aware that either Decedent Herson Hilaire or Decedent Hedson Hilaire was unarmed. DE 103, p. 7 Plaintiffs argue that this factual finding was flawed, because "[n]owhere, in any statement, of any Defendant, do they indicate that they even for a second thought that Herson or Hedson may have been in possession of a weapon." DE 103, p. 7.

An examination of Plaintiffs' Statement of Material Facts (DE 103–1) and the underlying record directly contradicts Plaintiffs' characterization. Paragraph 98 of Plaintiffs' Statement of Material Facts (DE 103–1) states, "[l]ater when the car door opens [Officer] Espiritusanto opens fire again on the driver because he is in fear because *he feels that Herson may be armed."* DE 103–1, ¶ 98 (emphasis added). In his sworn statement, Officer Espiritusanto explained, "So now I have-now we have him running that way and *I'm like in fear you know does this-is this guy armed* and what is he going to do so I saw that as another threat and reengaged him again...." DE 79–12, p. 16 (emphasis added). This sentiment is also consistent with Officer Bolduc's statement,

> There was some bushes here for some kind of concealment. I ended up, remember seeing the fire hydrant, and I wanted to use it for cover *'cause I wasn't sure if, you know, somebody's gonna come out shooting. Who knows?*

*You know, they just, you know, tried to run over, you know, one of our guys and kill one of our guys, so we didn't know what we were gonna be up against.*

DE 103–7, p. 7 (emphasis added). Plaintiffs' contention with respect to this issue is clearly erroneous and wholly unsupported by the record.

Third, Plaintiffs argue that Magistrate Judge Hunt improperly weighed the evidence when he found that there is "no inherent contradiction between the testimony of the officers who were merely feet away from the vehicle (the engine was revving) and Mr. Nicol's observations from a more remote location where he could not even see the vehicle (he did not hear the vehicle running)." DE 103, p. 10.

Again, the Court finds that Plaintiffs' Objection to this factual finding is not well taken, as there is no case law that supports the proposition that applications of deadly force should be divided into stages. Further, Plaintiffs fail to allege and support the assertion that the threat of serious physical harm was eliminated and fully secured. As such, whether or not the engine was revving is simply not a material fact to the substantive issue of qualified immunity in the above-styled cause.

Fourth, Plaintiffs challenge the Magistrate's assertion that Plaintiffs misstated the record regarding two issues: (1) whether the car was stationary when it was pinned against the tree and (2) whether a warning was given to Decedent Herson Hilaire before the Defendants shot him in the back. *See* DE 99, n. 7. With respect to both assertions, the Magistrate took issue with Plaintiffs' characterization of a witness's lack of memory as affirmative evidence of the fact in the negative.

Plaintiffs contend that Officer Bolduc's statement that he did not remember whether the reverse lights came on is affirmative evidence that the car was not attempting to reverse and, thus, was not a threat. DE 103, p. 9. Specifically, in his sworn statement, Officer Bolduc answered,

Q: Could you tell whether [the car] was trying to go forward or backwards? Could you see reverse lights? Could you see it rocking? Could you see? A: I don't, I don't recall. I, I don't remember if the reverse lights came on. I, I really don't even remember the taillights or anything, brake lights. I don't remember anything.

DE 103–7, p. 8. Plaintiffs' position is inapposite. The issue before this Court is not whether the car was a continued threat to Defendants, but rather, whether the Decedents themselves were a continued threat to Defendants. The threat posed by Decedents included, but was not limited to, the Decedents' use of the car as an instrumentality of force. As such, Plaintiffs' Objection to this factual finding is of no moment. Further, Plaintiffs fail to allege or to support with case law the assertion that rendering a car stationary represents the elimination of the threat of serious physical harm or that any such threat is thereby fully secured. As such, whether or not the car was stationary is immaterial to the substantive issue of qualified immunity in the above-styled cause.

Plaintiffs also contend that Officer Bolduc's statement that he did not remember whether a command was given is affirmative evidence that no command was made. DE 103, p. 10. Specifically, in his sworn statement, Officer Bolduc answered,

Q: When the driver exited the vehicle and, and took off, umm, were you or, did, was, was anybody giving verbal commands? Was anybody trying to order him to stop or, or anything like that? A: I don't remember.

DE 103–7, p. 8. Plaintiffs' Objection exhibits the very same logical fallacy identified by Magistrate Judge Hunt, arguing that

"[a] jury could find that because Officer Bolduc *did not command* Herson to stop running or show his hands and because he did not remember hearing anyone else give these commands that said commands were not given." DE 103, p. 10 (emphasis added). The statement of Officer Bolduc is that he did not *remember,* not that he affirmatively did not yell commands. Further, Officer Neuhaus affirmatively stated that he yelled out commands during this time, stating:

> [I] remember the, uh, the vehicle—I'm sorry the, uh, driver exited the car. He got out of the car he started run-running and I–I fired again at him and he collapsed right-right at this spot right here .... *I'm still giving verbal commands at that point.* I know for a fact I remember the-the passenger still inside the car, um, I couldn't see inside the, uh, you know to the side windows I couldn't see at all *that's why I kept screaming at-at the-at them let me see your hands, hands, hands.*

DE 79–14, p. 6 (emphasis added). Plaintiffs' position with respect to this issue is erroneous and wholly unsupported by the record.

The Court concludes its review with an astute observation contained in Magistrate Judge Hunt's Report and Recommendation (DE 99). In said Report, Magistrate Judge Hunt notes that:

> Plaintiffs take significant liberties with many of the facts presented in Plaintiff's [sic] Statement of Material Facts in Opposition to Defendants' Summary Judgment. ECF No. 79. When the source material is reviewed, it is clear that Plaintiffs repeatedly overstate or misstate the testimony referenced. The undersigned has not identified every instance but only certain glaring examples that bear on the clear understanding of the incident in question. Additionally, Plaintiffs' Response at ECF No. 78 is

replete with conclusions that are not supported by the evidence; rather, counsel simply makes factual assertions which are not supported by the record. Plaintiffs must use the facts and testimony accurately and cannot state conclusions or factual assertions that do not comport with the record evidence of the case. This Court must view the evidence in the light most favorable to the non-moving party, but not the unsupported conclusions of counsel or misstatements of the record evidence.

DE 99, n. 4. As discussed *infra,* it appears that Magistrate Judge Hunt's notation was of no consequence to Plaintiffs, as in their Objections (DE 103) they continued to misstate the record evidence and even contradicted their own pleadings.

For example, in one instance, Plaintiffs argue that,

> When [the] second round of gunfire stops there are no witness[es] present except the Defendant officers and *they claim that the third application of deadly force was used against a clearly injured and unarmed* Herson Hilaire as he exited the driver's side door and staggered to the east at which time the officers claimed that because they feared for the lives of the other officers who were to the east and the children who were in the area and so they fired another volley of bullets into Herson's back until he fell to the pavement.

DE 103, pp. 3–4 (*citing* DE 103–1, ¶¶ 90, 95, 98, 101) (emphasis added). Plaintiffs' Objection implies that the officer knew that Decedent Herson Hilaire was unarmed. This assertion in Plaintiffs' Objections (DE 103) is in direct contradiction to Plaintiffs' own Statement of Material Facts (DE 103–1). Plaintiffs' Objection relies on, *inter alia.* Paragraph 98 of Plaintiffs' Statement of Material Facts (DE 103–1), which states, "[l]ater when the car door

opens [Officer] Espiritusanto opens fire again on the driver because he is in fear because *he feels that Herson may be armed."* DE 103–1, ¶ 98 (*citing* DE 79–12, p. 16) (emphasis added). A further examination of the record reveals other contradictions in Plaintiffs' argument that Decedent Herson Hilaire was clearly unarmed. As highlighted in the Court's discussion regarding Plaintiffs' second Objection, Officer Espiritusanto stated as follows, "[s]o now I have—now we have him running that way *and I'm like in fear* you know does this—*is this guy armed* and what is he going to do so I saw that as another threat and reengaged him again...." DE 79–12, p. 16 (emphasis added). Again, Plaintiffs' Objection is unsupported by the record.

In another instance, Plaintiff misstates the sworn statement of Ms. Tomisha Banks, who "looked down and saw a clearly paralyzed Herson laying on the sidewalk *begging for help* directly below her window as the officers stood around him.... After Hedson was dragged to the street Ms. Banks watched as Herson *again cried out for help* and an officer walked up and cuffed his hands behind his back." DE 103, p. 4 (*citing* DE 103–1, 77–78, 80) (emphasis added). However, an examination of the sworn statement given by Ms. Banks reveals the following:

Q: Do you, can you hear what's happening outside as far as, uh, is anybody talking, yelling, anything like that?

A: The only person that I heard say anything, I mean, after the shots go off, umm—After the shots went off originally, I heard a yell, but *I didn't know what it was exactly.* And then after we go upstairs and we look down, the guy who was, umm, pretty much laying in front of my house, he was still breathing. *I only assume he yelled for help or like. "Hey." or something like that, 'cause he couldn't move.*

. . .

A: So, umm, after the guy who was laying on the ground, the first one who was in front of the house, he was laying there. After he *yelled out something,* a cop came up, and they put him in handcuffs.

DE 79–2, p. 5 (emphasis added). As is evident from the record evidence, Plaintiffs' assertions do not comport with the underlying evidence. Instead, Plaintiffs take liberties with the facts, in order to create a more favorable narrative, which is nonetheless based on unsubstantiated inferences.

After thorough review of the entire record, it is clear that Plaintiffs' Objections conform to their pattern of mischaracterization of the record evidence. Counsel for the Plaintiffs is reminded that he is an officer of this Court, and bound by the Rules Regulating the Florida Bar. Of particular note, Rule 4–3.3 of the Rules Regulating the Florida Bar requires Candor to the Tribunal. *See* R. Regulating Fla. Bar 4–3.3. As the comments to this Rule articulate, this Rule

... sets forth the special duties of lawyers as officers of the court to avoid conduct that undermines the integrity of the adjudicative process. A lawyer acting as an advocate in an adjudicative proceeding has an obligation to present the client's case with persuasive force. Performance of that duty while maintaining confidences of the client is qualified by the advocate's duty of candor to the tribunal. Consequently, although a lawyer in an adversary proceeding is not required to present a disinterested exposition of the law or to vouch for the evidence submitted in a cause, the lawyer must not allow the tribunal to be misled by false statements of law or fact or evidence that the lawyer knows to be false.

*See* Comments to R. Regulating Fla. Bar 4–3.3.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. Plaintiffs' Objections To Report And Recommendation As To Defendants' Motion For Summary Judgment (DE 103) be and the same are hereby **OVERRULED;**

2. The Report and Recommendation (DE 99) filed herein by United States Magistrate Judge Patrick M. Hunt be and the same is hereby approved, adopted, and ratified by the Court;

3. Consistent with the terms set forth in Magistrate Judge Hunt's Report and Recommendation (DE 99), Defendants' Motion For Summary Judgment (DE 73) be and the same is hereby **GRANTED;** and

4. Final Judgment will be entered by separate Order.

## REPORT AND RECOMMENDATION

PATRICK M. HUNT, United States Magistrate Judge.

This matter is before this Court on Defendants' City of Miramar ("City"), Officer Marc Moretti ("Moretti"), Officer Damaso Espiritusanto ("Espiritusanto"), Officer Bosco Neuhaus ("Neuhaus"), and Officer Michael Bolduc ("Bolduc") (collectively "the Officers") Motion for Summary Judgment filed on December 1, 2014.[1] (DE 73). The Honorable William J. Zloch referred to the undersigned all non-dispositive, pretrial matters for disposition and all dispositive, pretrial matters for a Report and Recommendation. (DE 5); see 28 U.S.C. § 636(b); see also S.D. Fla. L.R., Mag. R. 1. On January 8, 2015, the undersigned conducted a hearing on the above-referenced Motion. The undersigned has carefully reviewed Defendants' Motion (DE 73), Plaintiffs' Response (DE 78), Defendants' Reply (DE 85), the entire court file, oral argument of counsel and applicable law. Based thereon, it is respectfully recommended that this Court GRANT Defendants' Motion for Summary Judgment in its entirety and the undersigned further recommends that the state court wrongful death claim be DISMISSED, leaving Plaintiffs free to pursue this claim in state court if appropriate.

## I. BACKGROUND

Plaintiffs brought this action against the Officers pursuant to 42 U.S.C. § 1983, alleging a deprivation of decedents' constitutional rights under the Fourth and Fourteenth Amendments[2] of the United States Constitution.[3] Additionally, Plaintiffs have

---

1. To the extent the City and the Officers are addressed together, this Court will refer to them collectively as "Defendants."

2. The Fourteenth Amendment to the U.S. Constitution provides, in relevant part, as follows:

 All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of laws.

U.S. Const. amend. XIV, § 1. Plaintiffs' reference to the Fourteenth Amendment is purely for purposes of asserting their Fourth Amendment claims against the Defendants.

3. In Count I of the Third Amended Complaint, the operative pleading at this time, ECF No. 51, Plaintiffs have alleged both a § 1983 claim and a Florida Wrongful Death action pursuant to 768.16–768.26 Fla. Stat. against the Officers in their individual capacities. In light of the findings herein that no constitutional violation has been demonstrated, the undersigned declines to address the Florida Wrongful Death Act action which would at this point more appropriately be addressed by the state court. *But see Belizaire v. Miami,* 2013 WL 5780396 at *6–*7

also asserted a claim against the City of Miramar pursuant to § 1983 and seek compensatory damages in that regard.

## II. FACTS

The undersigned summarizes the pertinent undisputed facts as stated in the parties' Joint Pretrial Stipulation.[4] ECF No. 91. On February 1, 2011, Officers Moretti, Espiritusanto, Neuhaus, and Bolduc were all Police Officers assigned to the Miramar Police Department's Safe Streets Unit. The Safe Streets Unit is a proactive unit designed to lower or eliminate violent crimes. The incident in question occurred at the Tuscany Apartment complex. While on foot patrol in the pitch dark at

the Tuscany Apartments, Officers Espiritusanto and Bolduc observed through a sliding glass door two male individuals (later identified as Herson and Hedson Hilaire) in a well-lit townhome kitchen. Officer Espiritusanto walked within 2 or 3 feet of the sliding glass door and observed one of the males, a thin black male with short hair, Herson Hilaire, making a slicing motion with his hands at the kitchen counter. Both Officers, based upon their training, believed the two males were manufacturing narcotics. The other male, a heavier set black male with dreadlocks, Hedson Hilaire, was sitting on the counter top drinking out of a bottle of Heineken beer. Hedson walked toward the sliding glass

(S.D.Fla. Oct. 25, 2013) (quoting 776.085 Fla. Stat., which states, "[i]t shall be a defense to any action for damages for personal injury or wrongful death ... that such action arose from injury sustained by a participant during the commission or attempted commission of a forcible felony"; and 776.08 Fla. Stat.—definition of forcible felony including "any other felony which involves the use or threat of physical force or violence against any individual"). This Court directs Plaintiffs to 28 U.S.C. § 1367(d), which tolls the limitations period on claims asserted under § 1367(a) for thirty days, unless state law provides for a longer tolling period, so that the claim may be refiled in state court if deemed appropriate.

4. The undersigned has utilized all non-disputed facts and provided a summary of them herein. These facts were obtained from numerous pleadings, specifically, Defendants' Notice of Filing in Support of Motion for Summary Judgment, ECF No. 72, (Declarations of Officers Moretti, Espiritusanto, Neuhaus, Bolduc, Sergeant Sibner and Expert Report of Charles Drago); Defendants' Statement of Undisputed Facts in Support of Motion for Summary Judgment, ECF No. 74 (excluding paragraphs disputed by Plaintiffs); Plaintiff's [sic] Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment, ECF No. 79 and all exhibits thereto; Defendants' Response to Plaintiff's [sic] Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment, ECF No. 84; and the Joint Pretrial

Stipulation, ECF No. 91, establishing the stipulated facts agreed to by the parties requiring no proof. The undersigned conducted the laborious task of identifying all stipulated facts and corroborating assertions made by counsel with the actual record evidence.

Unfortunately, the undersigned finds that Plaintiffs take significant liberties with many of the facts presented in Plaintiff's [sic] Statement of Material Facts in Opposition to Defendants' Summary Judgment. ECF No. 79. When the source material is reviewed, it is clear that Plaintiffs repeatedly overstate or misstate the testimony referenced. The undersigned has not identified every instance but only certain glaring examples that bear on *the clear understanding of the incident in* question. Additionally, Plaintiffs' Response at ECF No. 78 is replete with conclusions that are not supported by the evidence; rather, counsel simply makes factual assertions which are not supported by the record. Plaintiffs must use the facts and testimony accurately and cannot state conclusions or factual assertions that do not comport with the record evidence of the case. This Court must view the evidence in the light most favorable to the non-moving party, but not the unsupported conclusions of counsel or misstatements of the record evidence. *See, e.g. Johnson v. Niehus*, 491 Fed.Appx. 945, 946, 949 (11th Cir.2012); *Jean–Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir.2010); *Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir.2009).

door and closed each of the vertical blinds. As a result, the Officers could no longer see inside. Officer Bolduc then approached a window to the townhome. Officer Bolduc saw Herson standing on the top of the countertop in the kitchen on the L-shaped corner, working on top of the corner cabinet. Herson reached up on top of the cabinet and retrieved a substantial bag of what appeared to be crack cocaine about the size of a racquetball, representing a distribution quantity of narcotics. Hedson then approached the window and closed those blinds.

Officer Bolduc retreated back to Officer Espiritusanto's position, where Officer Espiritusanto was on his radio requesting backup. Officer Bolduc relayed to Officer Espiritusanto the activity he witnessed in the apartment. Sergeant Andina and Officers Moretti and Neuhaus, also with the Miramar Police Department, then arrived at the Tuscany Apartment complex. Officers Moretti, Espiritusanto, and Neuhaus each observed children playing outside at the complex. All the Officers were wearing black tactical vests with the word Police in bold yellow lettering.

Officers Moretti, Espiritusanto, Neuhaus, and Bolduc met with each other and with Sergeant Andina. Officers Neuhaus and Moretti then relieved Officers Espiritusanto and Bolduc and took up positions near the townhome to observe the scene. Officer Moretti lay on the ground in the bushes near the townhome for approximately 45 minutes. A possible "knock and talk" plan was formulated by Sergeant Andina, but before the plan could be put into action, Officer Neuhaus radioed that one black male (Hedson) stepped out of the townhome and got into the passenger side of a vehicle parked in front of the townhome. Another black male (Herson), exited the townhome and got into the driver's side of the same parked vehicle. Both

males matched the description of those previously identified by Officer Bolduc as having been in possession of distribution amounts of what appeared to be crack cocaine.

The driver (Herson) then got back out of the vehicle and walked back to the townhome while looking around, and appeared to lock the front door of the townhome. Officers Espiritusanto and Bolduc ran back towards the townhome to provide backup for Officers Moretti and Neuhaus. Once the two males were both back in the vehicle, Sergeant Andina gave the order for the four officers to casually approach and make contact with the two men. Officer Moretti approached the front of the vehicle without his gun drawn, followed approximately five feet behind by Officers Espiritusanto, Neuhaus, and Bolduc, in order to continue their criminal investigation. *See also* ECF No. 72–3, Declaration of Officer Neuhaus. None of the Officers had guns drawn when they approached the vehicle.

Officer Moretti approached the front of the vehicle occupied by the two men, Herson and Hedson Hilaire. Officer Moretti raised his right hand to indicate to the men to stop, and said "hey police ... let me talk to you." Officer Moretti testified that he made eye contact with the driver and that the two men clearly saw him as he approached, since he was dressed in all black and across the front of his shirt it said "police." *See* ECF No. 72–1, 72–4; Declarations of Officer Moretti and Officer Bolduc. Officer Bolduc testified that he could see both Herson and Hedson's faces and that they had a "deer in headlights" look on their faces and both locked on to Officer Moretti. At that moment, the vehicle accelerated rapidly in reverse, to the point that the squealing sound of tires could be heard. All four Officers believed that the men could have fled or were fleeing since they had a clear path to escape.[5]

**5.** The Joint Stipulated Facts end at this point in the recitation of the events of the incident.

Instead of fleeing, the driver shifted the car into forward drive and accelerated rapidly towards Officer Moretti. ECF Nos. 72–1, 72–2, 72–3, 72–4; Declarations of the four Defendant Officers at the scene. Officer Moretti testified that he feared for his life and had probable cause to believe that the two men posed a threat of serious physical harm to him by running him over with their vehicle. Herson appeared to aim the vehicle at Officer Moretti and consciously tried to hit him. When the Officer tried to evade the approaching vehicle, the vehicle changed direction to continue coming toward him, striking the Officer and knocking him onto the hood of the vehicle and over the car. *See* ECF No. 72–2, ¶ 28, Declaration of Officer Espiritusanto. Just before the vehicle struck Officer Moretti, Officer Moretti un-holstered his firearm and fired several rounds from his service weapon at the driver of the vehicle. The other Officers describe observing Officer Moretti being hit by the vehicle with such force that his body rolled up onto the vehicle's hood and then onto the ground, out of the sight of the other Officers.

As Officer Moretti was hit, Officers Espiritusanto, Neuhaus, and Bolduc, not knowing Officer Moretti's location relative to the speeding vehicle and fearing for Officer Moretti's life, fired several shots at the driver of the vehicle. The vehicle continued to speed forward so quickly and with such force that it went over a raised sidewalk curb and into a tree, partially uprooting it.[6] The Officers testified that

---

Defendants supplement the stipulated facts presented above with, among other evidence, the declarations of the Officers at the scene. *See* ECF Nos. 72–1, 722, 72–3, 72–4. Plaintiffs also provided the recorded statements of the Officers taken by the Miramar Police Department which relate essentially the same facts as referenced in the declarations. The undersigned finds the continuation of these facts to be undisputed and provides a summary of the pertinent facts in order to present a complete picture. A full recitation of the circumstances that occurred on that evening is necessary for this Court to perform a careful and thorough constitutional analysis. Because the declarations provide a more organized recitation of the facts, the undersigned has cited to the declarations instead of the recorded statements when possible since both relay essentially the same set of facts.

Defendants object to Plaintiffs' use of the recorded statements of the Officers and the third party witnesses, Mr. Dustin Nicol and Ms. Tomisha Banks, taken and transcribed by Miramar Police Department Officers investigating this incident. The undersigned finds that these witnesses were sworn prior to giving their statements. 117.10 Fla. Stat. (law enforcement officers are authorized to administer oaths when engaged in the performance of their official duties). Additionally, 837.055 Fla. Stat. states that providing false information to a law enforcement officer during an investigation of a crime is a punishable offense. Accordingly, these statements have indicia of reliability, and their content could be presented at trial in an admissible form (*e.g.*, live testimony). The undersigned has therefore reviewed and used this evidence in analyzing the present Motion.

6. All four Officers testify that they could hear the vehicle continue to rev its engine after hitting the tree. Plaintiffs state that a neighbor, Mr. Dustin Nicol, witnessed some of the events of that evening, albeit from a distance in his townhome north/northwest of the scene of the incident. Mr. Nicol testified that he could not hear the vehicle's engine running, and that by the time he came out "there was no car running at all." ECF 79–1 at 22, lines 13–16, Recorded Statement of Dustin Nicol. Plaintiffs also state that Mr. Nicol testified that he did not hear the engine revving. ECF No. 78 at 15. However, the record indicates he was asked if he heard a car "maybe rev his engine or hit anything" but he did not respond to this part of the question. It should also be noted that Mr. Nicol states that from his vantage point he could not see the vehicle. ECF No. 79–1 at 21, lines 6–7, Recorded Statement of Dustin Nicol. At some point he saw the vehicle over the curb, but since he did not come all the way out of his townhome, he was unable to see the vehicle up against the tree. *Id.* at 22, lines 10–27. Plaintiffs claim that this testimony creates a material issue of fact precluding summary judgment since all of the Officers testified that

Officer Moretti was unresponsive, they did not know his whereabouts, and they were still in fear for his life due to the continuing threat that the vehicle could run over Officer Moretti again.[7] As such, they fired another sequence of shots from their firearms. *See, e.g.,* ECF No. 72–2, Declaration of Officer Espiritusanto. Officer Neuhaus testified that he feared Officer Moretti would be run over again and Officer Neuhaus was screaming "let me see your hands" to the occupants of the vehicle. ECF No. 72–3, ¶ 25, Declaration of Officer Neuhaus. Officer Bolduc testified that throughout the event, he yelled to the individuals to "let me see some hands, let me see some hands. Hands, hands, hands." ECF No. 72–4, ¶ 43, Declaration of Officer Bolduc; Recorded Statement of Officer Bolduc, ECF No. 79–13 at 96, lines 16–19.[8] There is no record evidence that either Herson or Hedson Hilaire complied

they did hear the engine revving. The Defendants contend that it is irrelevant whether the engine was revving.

The undersigned agrees with Defendants. The undersigned finds that whether the car was revving is irrelevant given the remaining facts and circumstances of this case. The Officers testified that they feared that the vehicle could be placed in motion after hitting the tree. They did not know Officer Moretti's whereabouts in relation to the car, nor did they know his condition, since he was not responding to them. They feared the occupants of the vehicle could put the car back into reverse gear and run over Officer Moretti again. Further, they feared the occupants of the vehicle could come out shooting or attempt to flee towards officers and children in the vicinity.

Defendants make a salient point that there is no inherent contradiction between the testimony of the Officers who were merely feet away from the vehicle (the engine was revving) and Mr. Nicol's observations from a more remote location where he could not even see the vehicle (he did not hear the vehicle running). It is not necessarily inconsistent for individuals to hear something from only a few feet away, while someone else at a distance would not be able to do so. Even so, the undersigned finds that it is unnecessary to address this point for the reasons stated above, and in light of the undersigned's obligation to consider this fact in the light most favorable to Plaintiffs.

7. Plaintiffs argue that "no reverse lights ever came on indicating that the car was not backing up." ECF No. 78 at 15. This statement, again misrepresents the record evidence. The testimony referenced (Officer Bolduc's) indicates that when asked about the vehicle's lights, he couldn't recall and didn't remember if the reverse lights came on; and couldn't remember the taillights or brake lights or anything in that regard. ECF No. 79–3 at 96, lines 12–13, Recorded Statement of Officer Bolduc. In any event, the undersigned does not find this argument material since the relevant inquiry is whether the Officers reasonably believed the occupants of the vehicle could cause serious injury to others by reversing the car and running over Officer Moretti again. There is certainly no record evidence that the car was "immobile" or rendered incapable of moving, as Plaintiffs assert, even with this Court accepting Plaintiffs' position that the car was not heard "running."

8. Plaintiffs state that once the vehicle hit the tree, the Officers concluded that "the car was not a threat to anyone" as the engine was not "revving" and "all four defendant officers were safely to the passenger side of the car." ECF No. 78 at 10. The undersigned has indicated that this Court will assume for purposes of this Motion that the engine was not heard revving despite the testimony of all four Officers indicating otherwise. It does not however establish that the occupants of the vehicle could not have put it in reverse gear as the Officers feared. Likewise, Plaintiffs' unsupported position misstates the testimony of the Officers. Their testimony clearly indicates that they still believed the vehicle and its occupants to be a threat of running over Officer Moretti again, as well as a threat to themselves. Nor did any testimony indicate that the Officers believed they were now in a "safe" position on the passenger side of the vehicle, as none of the occupants were surrendering or showing their hands, and the Officers did not know if there were weapons in the vehicle since they could not see inside the vehicle. *See, e.g.,* ECF No. 79–14 at 105, lines 24–25, Statement of Officer Neuhaus.

with the commands. Officer Moretti, who was knocked unconscious after being hit by the vehicle, awoke on the ground lying on his back only feet from the vehicle. Fearing he would be run over again, he fired several more rounds at the driver of the vehicle.

Seconds later, the driver of the vehicle, Herson Hilaire, exited the vehicle and began to run in the direction of other officers who set up a staging area to the east. There were also children playing in the streets and riding bicycles in the vicinity. Officer Neuhaus indicated that he was still giving verbal commands to both occupants of the vehicle during the entire sequence of events to "see their hands." ECF No. 72-3, ¶ 34, Declaration of Officer Neuhaus. Officer Moretti indicated that he could not

see Herson's hands as he was trying to escape. He testified that he had probable cause to believe Herson was still a threat because Herson just attempted to kill him with his vehicle, he could not see Herson's hands, he feared for his life and the lives of the other officers and the nearby children toward whom Herson was running, and Herson did not obey any of the Officers' commands. Officer Espiritusanto ordered Herson Hilaire to "stop running, stop running, stop running" but Herson did not respond to the commands. ECF No. 72-2, ¶ 37, Declaration of Officer Espiritusanto. Officer Espiritusanto, consistent with Officer Moretti, also testified that he could not see Herson's hands.[9] Officer Moretti testified that he recalled hearing yells of "show me your hands numerous times." ECF No. 72-1, ¶ 29; Declaration of Officer Moretti.[10] Neither

---

9. Plaintiffs state that "at no point in any of the defendants [sic] sworn statements did they claim to see either Herson or Hedson with any weapons in their hands and as Herson (the driver) exited the car none of the defendants saw him in possession of a weapon." *See* ECF No. 78 at 16. Plaintiffs also continuously refer to Herson being unarmed and ask this Court to infer that Defendants had knowledge of this fact, but Plaintiffs' record citations do not support this position. *Id.* at 18 (citing to PSMF 90 (Plaintiff's [sic] Statement of Material Facts) ECF No. 79, ¶ 90, which makes absolutely no reference to Defendants knowing that Herson was unarmed). Plaintiffs also state that both Herson and Hedson walked to the vehicle unarmed, again citing to no record evidence demonstrating that the Officers knew this fact. The record indicates that the Officers testified that upon Herson's attempt to flee the vehicle the Officers could not see Herson's hands to determine whether he was armed. *See, e.g.,* Declaration of Officer Moretti, ECF No. 72-1, ¶ 27; Declaration of Officer Espiritusanto, ECF No. 72-2, ¶ 38. In fact, their testimony clearly states they could not see his hands because it was pitch dark and that they were fearful that he was armed. *Id.* Moreover, Herson failed to comply with commands to show his hands.

10. Plaintiffs also significantly misstate the testimony of Officer Bolduc by indicating that

his sworn statement establishes that "when Herson exited the driver's side door and ran he did not hear any [sic] anyone give Herson commands to stop or anything like that" ECF No. 78 at 15; "according to Bolduc no warning was given to Herson" *Id.* at 17; "according to Bolduc no command or warning was given before he was shot in the back." *Id.* at 18. When Officer Bolduc's recorded statement is reviewed the actual testimony that he gave is as follows: "Uh, there was a lot of yelling. I remember, you know, myself for sure. I was just yelling, 'Hands, hands, hands,' you know, directing towards the car. 'Let me see some hands. Let me see some hands. Hands, hands, hands,' that, and, uh, I remember a lot of—you know, I can't remember really for sure what was said, you know. I, I, you know, I heard, 'Police.' And, you know, like, like I said, I was just yelling, yelling, yelling, 'Hands, hands, hands.' "

Two questions later, he is asked "When the driver exited the vehicle and, and took off, umm were you or, did, was, was anybody giving verbal commands? Was anybody trying to order him to stop or, anything like that?" He answers, "I don't remember." ECF No. 78-3 at pg. 96, lines 16–24. Not remembering whether something occurred is entirely different from asserting that Officer Bolduc testified to "not hearing anyone give Herson commands to stop" or unconditional-

Hedson nor Herson Hilaire responded to these commands. Officers Moretti, Espiritusanto, and Neuhaus, each having probable cause to believe Herson Hilaire committed an attempted homicide of a law enforcement officer and that he posed a continuing threat of serious physical harm either to the other officers staged in the area he was running toward,[11] the children playing in the complex, or to others, fired additional rounds at Herson Hilaire. He was shot and fell to the ground. The Officers testified that as a result of the actions of Herson and Hedson Hilaire, they acted in self-defense and defense of others including Officer Moretti, other officers staged in the area and the children playing in the complex. The gunshots ultimately resulted in the deaths of Herson and Hedson Hilaire. Hedson was shot 6 times total and was fatally wounded while seated in the passenger seat. Herson, the driver, was shot 7 times and ultimately died at the scene.[12]

On December 1, 2014, Defendants filed the instant Motion for Summary Judgment arguing that they are entitled to summary judgment on all the claims presented. ECF No. 73. Plaintiffs filed their Response opposing summary judgment on all claims on December 18, 2014. ECF No. 78. The Reply was filed thereafter and the undersigned heard oral argument of counsel on January 8, 2015.

## III. ANALYSIS

### A. *Motion for Summary Judgment Standard*

For purposes of a motion for summary judgment, summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." F.R. Civ. P. 56(c). In making this determination, this Court "must view all the evidence and the factual inferences reasonably drawn from the evidence in the light most favorable to the non-moving party" and "must resolve all reasonable doubts about the facts in favor of the non-movant." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir.1997); *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America*,

---

ly stating that "no command or warning was given before he was shot." Further, Plaintiffs in making this absolute and unsupported statement fail to address the testimony of the other Officers who affirmatively indicate that upon Herson exiting the vehicle they gave numerous commands to "stop running" and "show your hands," that the other Officers heard these commands, and that Herson chose not to comply with those commands. *See, e.g.*, ECF No. 72–2, ¶ 37, Declaration of Officer Espiritusanto; ECF No. 72–3, ¶¶ 25, 34, Declaration of Officer Neuhaus.

11. Sergeant Andina, Officer Bloom, Sergeant Dimler and Officer Brown were all staged to the east and Herson Hilaire attempted to flee the scene to the east. *See* Recorded Statement of Officer Espiritusanto, ECF No. 79–12 at 128, lines 4–12. Additionally, there were "kids all over the place" riding their bikes and playing outside. *See* Recorded Statement

of Officer Neuhaus, ECF No. 79–14 at 109, lines 2–4.

12. Plaintiffs indicate that a total of 49 shots were fired during this incident. However, the undersigned finds no significance to this fact. The Eleventh Circuit has explicitly found that "we cannot find a single case in this Circuit or from the Supreme Court that clearly establishes that a large number of shots fired makes a reasonable use of deadly force unreasonable." *Cooper v. Rutherford*, 503 Fed. Appx. 672 (11th Cir.2012). *See also Jean–Baptiste*, 627 F.3d at 822 (Officers are not required to "interrupt a volley of bullets" until threat is secured ... no reason to trust that plaintiff would not suddenly attempt to continue to do harm); *Crenshaw*, 556 F.3d at 1293 (Officers are not required to stop the use of deadly force until threat is secured when plaintiff had not shown any intention of surrendering).

894 F.2d 1555, 1558 (11th Cir.1990). Additionally, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.... The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.*

■ Where summary judgment is based on the defense of qualified immunity from § 1983 claims, "[q]ualified immunity offers complete protection for individual government officials performing discretionary functions insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Loftus v. Clark–Moore,* 690 F.3d 1200, 1204 (11th Cir.2012) (quoting *Sherrod v. Johnson,* 667 F.3d 1359, 1363 (11th Cir.2012) (per curiam)) (internal quotation marks omitted). To obtain qualified immunity, a defendant must establish that he was acting within the scope of his discretionary authority when the alleged violation occurred. *Oliver v. Fiorino,* 586 F.3d 898, 905 (11th Cir.2009).

### B. *Analysis of Claims*

1. Claims against the Individual Officers

 a. Excessive Force

■ Under 42 U.S.C. § 1983, private parties may enforce their federal constitutional rights and some federal statutory rights against defendants who acted under color of state law. The Code provides, in relevant part, as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. Though § 1983 is a vehicle for enforcing federal rights created by the U.S. Constitution or by other law, it does not create substantive rights. *Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Thus, before proceeding under § 1983, a plaintiff must first identify the specific constitutional right allegedly infringed. *Id.* (citing *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Baker,* 443 U.S. at 140, 99 S.Ct. 2689). Claims of excessive force by police officers are cognizable under 42 U.S.C. § 1983. *Fundiller v. City of Cooper City,* 777 F.2d 1436 (11th Cir.1985).

■ Here, Plaintiffs allege that Defendants violated decedents' rights under the Fourth [13] Amendment to the U.S. Constitution, including the rights not to be deprived of liberty and due process of law and the constitutional right to be free from the use of excessive force in the course of

---

**13.** The Fourth Amendment to the U.S. Constitution provides as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

apprehending a criminal suspect. The Supreme Court has held that, in the context of the Fourth Amendment, "[t]he word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement." *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *see generally Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (holding that "seizure" triggering Fourth Amendment protection occurs only when officer in some way restrained liberty of citizen by means of physical force or show of authority). The remaining inquiry is whether the seizure or use of force was reasonable under the totality of the circumstances. *Id.* at 8–9, 88 S.Ct. 1868. A claim that a law enforcement officer used excessive force in the course of an arrest, an investigatory stop, or any other seizure of a free citizen is to be analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

▉ In the instant case, it is undisputed that the Officers were acting within their discretionary authority, so the burden then shifts to Plaintiffs to show that the Officers committed a violation of Plaintiffs' constitutional rights and that the right was "clearly established" at the time of the incident. *Randall v. Scott*, 610 F.3d 701, 715 (11th Cir.2010).[14] To determine whether a right was clearly established at the time of the alleged violation, this Court must consider "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir.2002). This Circuit uses two methods to evaluate whether a reasonable

officer would know that his conduct is unconstitutional.

▉ The first method "looks at the relevant case law at the time of the violation; the right is clearly established if 'a concrete factual context [exists] so as to make it obvious to a reasonable government actor that his actions violate federal law.'" *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir.2011) (quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1333 (11th Cir.2008)). While the facts need not be identical, "the unlawfulness of the conduct must be apparent from pre-existing law." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir.2011); *see also Gennusa v. Canova*, 748 F.3d 1103, 1113 (11th Cir.2014) ("We do not always require a case directly on point before concluding that the law is clearly established, but existing precedent must have placed the statutory or constitutional question beyond debate."). In the context of excessive force claims, the Eleventh Circuit has previously noted that "generally no bright line exists for identifying when force is excessive." *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir.2000). Therefore, "unless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity." *Id.*

▉ The second method "looks not at case law, but at the officer's conduct, and inquires whether that conduct 'lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case law.'" *Fils*, 647 F.3d at 1291 (quoting *Vinyard*, 311 F.3d at 1355). Referred to as "obvious clarity,"

---

**14.** The order of the two step analysis of determining whether the defendant's conduct violated a plaintiff's constitutional right and then whether the right was clearly established is left to the discretion of district courts to determine in light of applicable circumstances. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

this method creates a narrow exception to the general rule requiring particularized case law to determine whether a right is clearly established. *Id.* To fall within this exception, the officer's conduct must have been "so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point." *Priester,* 208 F.3d at 926 (quoting *Smith v. Mattox,* 127 F.3d 1416, 1419 (11th Cir.1997) (per curiam)). Under this test, this Court must determine whether the application of the excessive force standard "would inevitably lead every reasonable officer in [the defendant's] position to conclude that the force was unlawful." *Id.*

■■■■■ "In order to determine whether the amount of force used by a police officer was proper, a court must ask 'whether a reasonable officer would believe that this level of force is necessary in the situation at hand.' " *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1559 (11th Cir. 1993). The Eleventh Circuit has held that the "reasonableness [of the officer's actions] is dependent on all the circumstances that are relevant to the officer's decision to use deadly force, including the seriousness of the crime, whether the suspect poses an immediate danger to the officer or others, whether the suspect resisted or attempted to evade arrest, and the feasibility of providing a warning before employing deadly force." *Jean–Baptiste,* 627 F.3d at 821. "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz,* 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

■■■■■ "For over thirty years, *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), has guided courts' Fourth Amendment reasonableness analysis where officers use lethal force."

*Belizaire,* 2013 WL 5780396 at *2. The proper application of force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Tennessee v. Garner,* 471 U.S. at 8–9, 105 S.Ct. 1694 (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure"); *see also Plumhoff v. Rickard,* —— U.S. ——, ——, 134 S.Ct. 2012, 2020, 188 L.Ed.2d 1056 (2014) ("the inquiry requires analyzing the totality of the circumstances."). The Supreme Court in *Garner* held that the use of deadly force is more likely reasonable if: (i) the suspect poses an immediate threat of serious physical harm to officers or others; (ii) the suspect committed a crime involving the infliction or threatened infliction of serious harm, such that his being at large represents an inherent risk to the general public; and (iii) the officers either issue a warning or could not feasibly have done so before using deadly force. *Id.* at 11–12, 105 S.Ct. 1694.

■■■■■ "The court must be careful to evaluate the reasonableness of an officer's conduct on a case by case basis from the perspective of a reasonable officer on the scene." *Post v. City of Ft. Lauderdale,* 7 F.3d 1552, 1559 (11th Cir.1993). Furthermore, the Eleventh Circuit has made clear that "[b]ecause the Constitution permits the use of deadly force to prevent a violent suspect from escaping, the Constitution must also permit the use of deadly force against a suspect who poses not merely an escape risk (because he is not yet in police control), but also an imminent threat of danger to a police officer or others." *Clark v. City of Atlanta, Ga.,* 544 Fed. Appx. 848 (11th Cir.2013) (citing *McCor-*

*mick v. City of Ft. Lauderdale*, 333 F.3d 1234, 1246 (11th Cir.2003)).

To be entitled to qualified immunity, "an officer need only have arguable probably cause" to employ deadly force. *Id.* at 856. Further, a police officer is entitled to continue his use of force until a suspect thought to be armed is "fully secured." *Id.* (citing *Crenshaw*, 556 F.3d at 1293). "It makes sense that, if officers are justified in firing at a suspect in order to end a severe threat to public safety, they need not stop shooting until the threat has ended." *Plumhoff*, 134 S.Ct. at 2016. *See also Flowers v. City of Melbourne*, 557 Fed.Appx. 893 (11th Cir.2014) (officers entitled to continue to use force until suspect thought to be armed is fully secured); *Clark v. City of Atlanta*, 544 Fed.Appx. 848, 857 (11th Cir.2013) (police officers "acted reasonably in continuing to shoot at [decedent] until the threat of serious physical harm was eliminated and [decedent] was fully secured"); *Carr v. Tatangelo*, 338 F.3d 1259, 1273 (11th Cir. 2003) (qualified immunity applied to officer who after hearing a fellow officer shoot one round, fired his gun eight times shooting to kill in order to eliminate the threat).

It is important that a reviewing court evaluate "the use of force from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The Supreme Court cautioned that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–397, 109 S.Ct. 1865; *See also, Fernandez v. City of Cooper City*, 207 F.Supp.2d 1371, 1377 (S.D.Fla.2002).

The Eleventh Circuit Court of Appeals has routinely found that the use of deadly force by law enforcement officers is permissible toward a suspect utilizing an automobile as a deadly weapon against law enforcement officers. *McCullough v. Antolini*, 559 F.3d 1201 (11th Cir.2009). The Court stated "we have … consistently upheld an officer's use of force and granted immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." *Id.* at 1207. Qualified Immunity is routinely granted in instances that "involved a driver using a vehicle 'in a dangerous and aggressive manner' that provided the officers with ample reason to believe that the driver 'posed a threat of serious physical harm or death to the officers, or other passerby, especially in light of the speed with which the incident unfolded.' " *Terrell v. Smith*, 668 F.3d 1244, 1254 (11th Cir.2012) (citing *McCullough*, 559 F.3d at 1208). "[U]nder the law the threat of danger to be assessed is not just the threat to the officers at the moment, but also to the officers and other persons if the chase went on." *Pace v. Capobianco*, 283 F.3d 1275, 1280 n. 12 (11th Cir.2002). Police are not required to call off the pursuit and hope for the best. *Scott v. Harris*, 550 U.S. 372, 385, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

In the instant case, Herson and Hedson Hilaire saw Officer Moretti casually approach them without his gun drawn. Officer Moretti identified himself as a police officer verbally and by the clear markings on his uniform and asked to talk with them. At that point, Herson and Hedson backed out of the parking spot quickly with their tires screeching. Instead of fleeing the apartment complex, decedents consciously chose to put the car in forward gear and struck Officer Moretti, who was

catapulted onto the top of the car and over it. These acts constitute attempted vehicular homicide of the Officer. Officer Moretti was able to fire a few shots at the driver before he was hit by the car. He was rendered briefly unconscious and was unresponsive to the other Officers, who just witnessed the decedents hit Officer Moretti. The other Officers also fired shots at the driver. The vehicle jumped the curb and hit a tree.

Because of the darkness, the Officers were unable to see the vehicle occupants' hands and the Officers feared that they were armed. Neither occupant of the vehicle showed any signs of responding to commands to show hands. The Officers still did not know Officer Moretti's condition or whereabouts and feared he would be run over again if the car were put in reverse gear. They feared for their own lives and the lives of the people at the apartment complex and they continued to shoot into the car, since the threat was still present and not secured.[15]

Seconds later the driver of the car, Herson Hilaire, started running east towards an area where other officers were present and where children were playing. Commands were given to stop running and to show hands but the commands were not heeded. At this point, Herson Hilaire was fleeing from the scene of a violent felony and had already demonstrated that he was prepared to use deadly force. In fear for the safety of those in his path, the officers shot him.

Plaintiffs argue that this Court should evaluate the events and actions of that evening in three separate stages. Plaintiffs state that the initial attempted vehicular homicide should be the first stage; the time period when the vehicle was lodged against the tree after speeding toward Officer Moretti and catapulting him over the car would be the second stage; and, finally, the third stage would be Herson Hilaire's attempt to escape the vehicle and flee toward other unsuspecting officers and children playing in the apartment complex.[16] The undersigned notes that the

**15.** Plaintiffs argue that the Officers should not have fired at the vehicle once it hit the tree because both Herson and Hedson were "unarmed" and sitting in a "stationary vehicle" "while having no reason to believe that either Herson or Hedson would place anyone's safety at risk." ECF No. 78 at 13. This argument is both factually inaccurate in light of the record evidence and legally unsupported. First, it is factually inaccurate because the record establishes that the Officers did not know if the occupants had weapons. But they did know that the Hilaires had used and could continue to use the vehicle as a deadly weapon. They had a reasonable belief that decedents could still place the Officers' and others' safety at risk having just run over a police officer. *See also Carr v. Tatangelo*, 338 F.3d 1259,1269 n. 19 (11th Cir.2003) ("It is true that [the officer] did not see a gun in [the suspect's] hands, but it is also true that he could not confirm that [the suspect] was unarmed. We will not second-guess the split-second judgment of a trained police officer merely because the judgment turns out to be

mistaken, particularly where inaction could have resulted in death or serious injury to the officer or others."). Additionally, there is no evidence that the car was incapable of being put into reverse and causing further risk to those at or close to the scene. Second, the case law cited by Plaintiffs as factually similar is markedly distinguishable as discussed in more detail infra. "The law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Martinez v. Halabi*, 2012 WL 222069 *4 (S.D.Fla. Jan. 25, 2012) (citing *Jean–Baptiste*, 627 F.3d at 821) (finding that "regardless of whether [the defendant] had drawn his gun, [the defendant's] gun was available for ready use, and [the officer] was not required to wait and hope for the best").

**16.** *See Brosseau v. Haugen*, 543 U.S. 194, 125 S.Ct. 596, 598, 160 L.Ed.2d 583 (2004) (qualified immunity applied when suspect shot as he fled in vehicle given risk posed to persons in immediate area).

events of the evening were fluid. There were no temporal lapses or pauses.[17] From the moment Officer Moretti was hit by decedents' vehicle, there is no record evidence to support the idea that decedents would not try to do further harm to the Officers or others, and no evidence they would cease or surrender. *See Plumhoff,* 134 S.Ct. at 2022 (holding "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended" and noting "if lethal force is justified, officers are taught to keep shooting until the threat is over").

The undersigned finds that the transition between each of the stages that Plaintiffs point to was rapid, requiring split-second judgments, action and reaction from the Officers over a matter of seconds. In the first sequence of shooting, the decedents attempted to kill the Officer with their vehicle. In the next sequence of shooting, the Officers were not aware of Officer Moretti's whereabouts or condition and feared that he was still in danger. As long as decedents were still in control of the vehicle, the Officers believed that they and Officer Moretti were still in immediate danger. Finally, once Herson opened the door to the vehicle and tried to flee the scene, the Officers still considered Herson an immediate lethal threat. He had just attempted to kill an officer and continued to fail to comply with verbal commands to

show his hands or to stop running. The Officers could not see his hands and he was running in the direction of unsuspecting officers and children playing in the street. Herson was fleeing from the scene of a violent felony, and had already demonstrated that he was prepared to use deadly force against anyone who tried to arrest him. At that point, he was shot to secure the threat that he continued to pose.

In *Terrell v. Smith,* 668 F.3d 1244 (11th Cir.2012), not only was the Eleventh Circuit faced with a factually similar situation but the Court provided an analysis of the previous case law involving the use of deadly force when a vehicle is used as a deadly weapon and hits an officer. In *Terrell,* the officer used lethal force in a fast-paced scenario where decedent failed to follow commands and attempted to turn his vehicle in the officer's direction and flee, striking the officer in the process. The officer shot and killed the suspect. The Eleventh Circuit found that the officer was entitled to qualified immunity since the use of deadly force was reasonable under the facts and circumstances of the case and there was no clearly established law at the time of the incident that would have given the officer fair notice that his actions violated the Fourth Amendment. *Id.* at 1248. This Circuit found that the officer's actions did not violate the decedent's Fourth Amendment rights. The

**17.** This Court has identified record evidence which assists the undersigned in attempting to estimate the amount of time in which the incident occurred. Mr. Nicol states it took him approximately 5 seconds to walk through his townhome after first hearing shots and then, upon arriving outside, he heard a warning yelled to "get down" followed by what Plaintiffs refer to as the second round of shooting. ECF No. 79–1 at 18–20, Recorded Statement of Mr. Dustin Nicol. Thus, the second round of shooting began seconds after the initial shots were fired as Officer Moretti was run over. Then, from the second round

to the third round of shooting, Plaintiffs admit that it was "seconds" after the vehicle hit the tree that Herson exited the vehicle and began to run east. ECF Nos. 74, 79, ¶ 46. Ms. Tomisha Banks also testified that she heard two shots and then eight to ten more "immediately" after that. ECF No. 79–2 at 10. The undersigned finds that the incident was fast paced and the events occurred in rapid succession. This Court finds that in the instant case whether the incident is evaluated as one that took seconds and flowed seamlessly or whether it is evaluated as three distinct stages, no constitutional violation occurred.

Eleventh Circuit also found that the law was not clearly established at the time that would place the officer on notice that what he did would be unlawful. The Court reaffirmed that "[u]nder circumstances like these, we have … consistently upheld an officer's use of force and granted qualified immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." *Id.* at 1253 (quoting *McCullough*, 559 F.3d at 1207).[18]

Likewise, the Court cited to its decision in *Robinson v. Arrugueta*, 415 F.3d 1252 (11th Cir.2005) where deadly force was found reasonable under the Fourth Amendment in circumstances less threatening than in the instant case, where an officer was positioned between his vehicle and the suspect's vehicle. The officer identified himself verbally as "police" and told plaintiff to put his hands up. *Id.* at 1254. Plaintiff made eye contact with the officer but did not comply with the command. *Id.* Instead, the suspect began to move his vehicle forward toward the officer "at a likely speed of one to two miles per hour." *Id.* The Court concluded the use of deadly force was reasonable because the officer "had to make a split-second decision of whether he could escape before he got crushed." *Id.* at 1256.

Similarly, the Court also cited to *Pace v. Capobianco*, 283 F.3d 1275 (11th Cir.2002), which involved a high speed chase which ended in a cul-de-sac. The decedent remained in the car while officers yelled at him to exit the vehicle. The officer fired two shots at decedent through the front windshield. The vehicle began moving forward and two officers each fired five more rounds, killing decedent. The Court found that the decedent's reckless driving gave reasonable police officers probable cause to believe that the vehicle had become a deadly weapon with which decedent was armed, as did his refusal to exit the vehicle and his failure to heed police warning. *Id.* at 1253 (citing *Pace*, 283 F.3d at 1282). The Eleventh Circuit found that the use of deadly force did not violate plaintiff's Fourth Amendment rights.

In *Long v. Slaton*, 508 F.3d 576 (11th Cir.2007), the Court again granted qualified immunity to an officer who used deadly force after his police cruiser was occupied by a mentally unstable individual who did not comply with the officer's command to stop the car. In *Long*, the individual was reversing away from the officer yet the Court found that "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Id.* at 581. The Court noted the "obvious" fact that "Long could have quickly shifted gears and accelerated toward [the officer] at any time." *Id.* Similarly, the undersigned finds that although Plaintiffs' vehicle hit a tree after running over Officer Moretti, the Officers could reasonably believe that this fact would not preclude Plaintiffs from shifting gears and running over Officer Moretti again, or other Officers or bystanders at the scene.

Finally, the *Terrell* Court cited to *McCullough v. Antolini*, another case involving the use of a vehicle as a deadly weapon. The driver of a truck suspected of being involved in a drug transaction led police on a high-speed chase. 559 F.3d at 1202–3. When the vehicle came to a stop surrounded by officers, the suspect refused to show his hands or reply at all to

---

18. *See also Johnson v. Niehus*, 491 Fed.Appx. 945 (11th Cir.2012) (Plaintiff turned car various times toward multiple officers at the scene, officers fired their weapons, plaintiff continued to ignore their commands; Court found that the officers did not violate plaintiff's Fourth Amendment rights and were justified in using deadly force).

the officers' commands. *Id.* When an officer's vehicle became stuck after skidding into the suspect's truck, the officers opened fire. The suspect backed his truck up and then drove it toward an officer's cruiser, forcing him to jump onto the hood of his own car to avoid being hit. As the suspect began to drive away, the officer continued to fire at the truck killing the decedent. The Court again held that the officer was entitled to qualified immunity.

The undersigned also finds instructive the facts of the recent Supreme Court decision in *Plumhoff v. Rickard,* —— U.S. ——, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014). Plaintiff led police on a high speed chase that came to a temporary halt. Plaintiff resumed maneuvering his car even though his bumper was flush against a patrol car. *Id.* at 2017. At that time, an officer fired three shots into plaintiff's car. *Id.* The plaintiff managed to drive away, *almost* hitting an officer in the process. *Id.* Officers fired twelve more shots as he was trying to escape, striking him and the passenger, both of whom died from the gunshot wounds. *Id.* at 2018. In the instant case, we have more egregious facts since decedents ran over Officer Moretti resulting in the Officers responding with deadly force. The Supreme Court in *Plumhoff* found that the officers' conduct did not violate the Fourth Amendment. The Court also found that when the shots were fired, all a reasonable officer could conclude from plaintiff's conduct was that he was intent on resuming his flight. *Id.* at 2022. The undersigned finds this analogous to Herson exiting the vehicle and failing to heed commands to show his hands or to stop running. The plaintiff in *Plumhoff* made the argument that it was unreasonable to fire a total of 15 shots even if deadly force was reasonable. *Id.* The Supreme Court rejected this argument and held that if officers are justified in firing at a suspect in order to end a severe threat to public safety, they need

not stop shooting until that threat has ended. *Id. See also Cooper v. Rutherford,* 503 Fed.Appx. 672 (11th Cir.2012) (24 shots fired; court stated no cases have held that the number of shots fired makes reasonable use of force unreasonable).

The facts of the instant case are far graver than those presented above. Here, the decedents committed an attempted murder of a police officer with the use of their vehicle; they did not heed any commands to show their hands; they did not surrender; they continued to pose a lethal danger to Officer Moretti while in the car since they could have shifted the car into reverse and run him over again; and finally, upon fleeing the vehicle, Herson Hilaire again refused to heed commands to stop running and show his hands. He continued to be a threat of serious harm to the individuals staged to the east and the children playing in the parking lot. Accordingly, based on the abundance of case law from our Circuit, the undersigned finds that the Officers herein are entitled to qualified immunity, and that their use of lethal force was reasonable under the Fourth Amendment.

■■■ In light of the findings above, the undersigned could end the inquiry finding that the Officers did not violate the decedents' Fourth Amendment rights. However, the undersigned notes that the question of whether the law was clearly established to put the Officers on notice that their actions were unlawful under the particular facts of the case also fails. As demonstrated above, an examination of this Circuit's law largely establishes the opposite conclusion—that the Eleventh Circuit has consistently upheld an officer's use of force and granted qualified immunity where the decedent used or threatened to use his car as a weapon to endanger the officers immediately preceding the officers' use of deadly force.

Because this Court finds that the Officers acted reasonably under the circumstances and did not violate the decedents' constitutional rights, the undersigned need not address the clearly established prong of the qualified immunity analysis. Nonetheless, even if this Court found that a constitutional violation occurred, the Officers would be entitled to qualified immunity because the case law discussed above would demonstrate to reasonable officers that the conduct in this incident was protected and no case law would have existed to clearly establish that their actions were not authorized.

There are two ways for a party to show that the law was "clearly established" that a particular amount of force used was excessive. First, the party can point to a "materially similar case that has already been decided that what the police officer was doing was unlawful." *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001). The second is a narrow exception that allows a party to show that "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002). This second theory is only viable when existing law would "inevitably lead every police officer in [the defendant's] position to conclude the force was unlawful." *Id.* Plaintiffs do not argue the second exception but rather purport to rely upon "materially similar cases" that Plaintiffs argue gave the Officers herein "fair warning" that the shots fired when the car was against the tree and when Herson was fleeing amount to excessive force. Plaintiffs cite to *Vaughan v. Cox*, 343 F.3d 1323 (11th Cir.2003), but the facts are not materially similar. In *Vaughan*, accepting plaintiff's version of the facts, a passenger was struck by a bullet fired by a police officer into a speeding truck, which was not driving erratically, in an attempt to stop the truck even though it did not present an immediate threat of serious harm to the officer or others on the road. *Id.* at 1330.

Plaintiffs also cite to *Morton v. Kirkwood*, 707 F.3d 1276 (11th Cir.2013). This case was decided nearly two years *after* the incident in question, so clearly the Officers herein would have no knowledge of the facts or holding in *Morton*. Plaintiffs nonetheless argue that the cases relied on in *Morton* would have provided these Defendant Officers with fair notice that their actions were unlawful, since the shooting in *Morton* occurred in 2010. This argument has no merit because the cases relied on in *Morton* are the cases cited above where qualified immunity was granted.

Plaintiffs argue that the facts of *Morton* are materially similar to the instant case. But the undersigned finds that the facts of *Morton* are markedly distinguishable. In Morton's version of the events, the officer shot an unarmed man in a stationary vehicle while having no reason to believe that the man would place anyone's safety in danger. *Id.* at 1282. The officer had no reason to believe that plaintiff committed any crime, let alone a serious crime involving the infliction or threatened infliction of serious physical harm. *Id.* at 1281. Morton testified that he shifted his car to park and raised his hands when he heard the officer shout to him. *Id.* at 1282. Finally, there were numerous and significant material issues of fact in dispute in *Morton* precluding summary judgment. *Id.* As such, Plaintiffs wholly fail to meet the "clearly established" prong of the qualified immunity analysis in that the cases cited do not demonstrate materially similar cases that were already decided that would have placed the Officers on notice that what they were doing was unlawful.

Because Plaintiffs have failed to carry their burden of demonstrating a constitutional violation and any clearly established law showing the conduct involved was unlawful, the undersigned recommends that Defendants' Motion for Summary Judgment be GRANTED as to the Defendant Officers.

2. Claims against the City

■ In the absence of a constitutional violation by the Officers, the claims against the City must fail. Because the Officers did not violate the decedents' constitutional rights, there is no basis for municipal liability under § 1983. *Clark*, 544 Fed.Appx. at 857 (citing *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir.1996) ("[A]n inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred.")). To state a claim against a governmental agency under § 1983, the pleading party must plausibly show that (1) the plaintiff suffered a federal constitutional or statutory-right injury; and (2) the injury was a result of a governmental policy or custom. *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also City of Canton v. Harris*, 489 U.S. 378, 380, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (holding that there must be direct causal link between municipal policy or custom and alleged constitutional deprivation); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Since Plaintiffs have failed to show a constitutional violation, there is no municipal liability.

■ Even if this Court had found a constitutional violation, upon analyzing the City's policies, the undersigned would find no municipal liability. In the Joint Pretrial Stipulation, in the stipulated facts sec-

tion, Plaintiffs admit that the City had a use of force "Response to Resistance" Policy No. 102 ("the Policy") in effect at the time of the February 1, 2011 incident.[19] The Policy conformed to the scope and guidelines of the applicable Florida Statutes as to appropriate police response to resistance. Pursuant to the Policy, "[o]fficers may use deadly force to protect themselves or others from what they reasonably believe to be an immediate threat of death or serious injury." Furthermore, the Policy states that "[a]n officer may use deadly force to effect the capture or prevent the escape of a suspect if the officer reasonably believes the suspect has committed a felony involving the use or threatened use of deadly force and the officer has probable cause to believe the suspect poses an immediate threat of death or serious physical injury to the officers or others." The Policy also states that "officers shall not draw or exhibit their firearm or any other weapon unless there is a reasonable cause to believe that it may be necessary to lawfully use the weapon as authorized by this policy." The joint stipulated facts also acknowledge that all the Officers in question attended and participated in numerous use of force training sessions and were all officers in good standing on the date of the incident.

The undersigned finds that these policies comport with the constitutional mandates outlined by the Supreme Court and the Eleventh Circuit as more fully addressed herein. Moreover, there is no evidence that the Officers did not execute the policies properly, and no municipal liability exists for such conduct even in the event it could be demonstrated. *Mingo v. City of Mobile*, 592 Fed.Appx. 793, 802–03 (11th Cir.2014) (plaintiff attempted to assert a

---

**19.** All the facts contained in this section are obtained from the Joint Stipulated Facts submitted in the Joint Pretrial Stipulation submitted by the parties and are undisputed. ECF No. 91 at 6–8. Any other undisputed facts will be specifically cited to the record.

failure to train civil rights claim against a municipality premised not upon the policies themselves, but upon the purported fact that there was "no training or supervision to ensure that the officers understood the procedures or could execute them properly, if at all"; Court affirmed summary judgment in favor of the City finding no deliberate indifference since City provided training).

■ "A plaintiff ... has two methods by which to establish a [governmental entity's] policy: identify either (1) an officially promulgated [entity] policy or (2) an unofficial custom or practice of the [entity] shown through the repeated acts of a final policymaker for the [entity]." *Grech v. Clayton Cnty., Ga.,* 335 F.3d 1326, 1331 (11th Cir.2003) (citing *Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018; *Brown v. Neumann,* 188 F.3d 1289, 1290 (11th Cir. 1999)); *see also Wakefield v. City of Pembroke Pines,* 269 Fed.Appx. 936, 939 (11th Cir.2008) (defining "policy" and "custom" for purposes of municipality liability).

■ Plaintiffs' Response conclusorily states that the City improperly trains its officers to "use deadly force against any person whom they perceive to be a threat." Response at 18. There is simply no record evidence to support this statement and the stipulated facts filed after the Response negate this statement as well. "Municipal policy or custom may include a failure to provide adequate training if the deficiency 'evidences a deliberate indifference to the rights of inhabitants.'" *Lewis v. City of West Palm Beach, Fla.,* 561 F.3d 1288, 1291 (11th Cir.2009) (quoting *Canton,* 489 U.S. at 380, 109 S.Ct. 1197).

■ The Supreme Court addressed the "deliberate indifference" standard as follows:

Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.

Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution. A less stringent standard of fault for a failure-to-train claim would result in *de facto respondeat superior* liability on municipalities.

*Connick,* 131 S.Ct. at 1359–60 (citations omitted) (internal quotation marks omitted). Thus, it is ordinarily necessary to demonstrate a pattern of similar constitutional violations to proceed under a failure-to-train theory. *Id.* at 1360 (citing *Bd. of Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)); *see also Canton,* 489 U.S. at 389, 109 S.Ct. 1197 ("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983.").

In *Canton,* the Supreme Court acknowledged that although it may seem counterintuitive to assert that a local government would have a policy of not taking reasonable steps to train its employees,

[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

489 U.S. at 390, 109 S.Ct. 1197. *But see City of Oklahoma City v. Tuttle,* 471 U.S.

808, 821, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (holding that district court erred by permitting jury to infer deliberate indifference or gross negligence from a single excessive force incident); *Brooks v. Scheib,* 813 F.2d 1191, 1193 (11th Cir.1990) (even though there had been ten citizen complaints about officer, city did not have notice of past police misconduct because plaintiff never demonstrated that the prior complaints had any merit).

At oral argument, Plaintiffs asserted that the instant case falls within the *Canton* exception. The undersigned finds this argument to be without merit or record support. There is no evidence of any deliberate indifference on the part of the City or that the City failed to adequately train and supervise its police officers, which in turn caused constitutional violations against Plaintiffs. Further, to assert a claim against a local government for failure-to-train or adequately train, generally a plaintiff must show a pattern or repeated acts that establish the deliberately indifferent policy or custom or a conscious choice not to adequately train an entity's officers. *See Grech,* 335 F.3d at 1331. Here, Plaintiffs failed to present any evidence of repeated acts or a pattern that could constitute a deliberately indifferent policy or custom on the part of the City. Plaintiffs present no evidence of the assertion that the City's failure to conduct improved training or supervision of these Defendant Officers was the "moving force" behind a constitutional violation.

Much more must be established in order to establish liability against the City.[20] There is simply nothing in the record to show any kind of pattern or practice to demonstrate deliberate indifference on the part of the City.

As such, the undersigned recommends that the Motion for Summary Judgment be GRANTED as to Defendant City of Miramar.

3. State Law Claim for Wrongful Death based on Excessive Force

Finally, with regard to the state law claim of wrongful death due to excessive force against all of the Defendant Officers, in light of the recommendation herein that summary judgment be granted on all federal claims and the finding that no constitutional violation has been evidenced, the undersigned recommends that the wrongful death action be DISMISSED with leave to pursue same in state court if appropriate.

## IV. RECOMMENDATION

Based on the foregoing, the undersigned recommends that Defendants' Motion for Summary Judgment (DE 79) be GRANTED as to all Defendants and that the state law wrongful death claim be DISMISSED.

The parties will have fourteen (14) days after being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William J. Zloch, United States District Judge. *See* 28 U.S.C. § 636(b)(1) (providing procedure for review of magistrate judge Report and Recommendation). Failure to timely file objections shall bar the parties from a de novo determination by Judge Zloch of any issue covered in the Report and shall bar the parties from challenging, on appeal, the factual findings accepted or adopted by this Court, except upon grounds of plain error or manifest injustice. *See Thomas v. Arn,* 474 U.S. 140, 145–53, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985) (holding that party waives appellate

---

**20.** Unsupported allegations at this stage of the litigation are insufficient to defeat a motion for summary judgment.

review of magistrate judge's factual findings that were not objected to within period prescribed by 28 U.S.C. § 636(b)(1) (citing *United States v. Walters,* 638 F.2d 947, 949–50 (6th Cir.1981))); *see also Dupree v. Warden,* 715 F.3d 1295, 1300 (11th Cir. 2013) (holding that under current Eleventh Circuit rule: "[T]he failure to object limits the scope of our appellate review to plain error review of the magistrate judge's *factual findings[;* however,] failure to object to the magistrate judge's *legal conclusions* does not preclude the party from challenging those conclusions on appeal.").

RESPECTFULLY SUBMITTED at Fort Lauderdale, Florida this 13th day of March, 2015.